DENOYER *v.* RYAN.

(*Circuit Court, D. Minnesota.* June Term, 1885.)

PEDIGREE—EVIDENCE.

> After a full consideration of the evidence in this case, *held*, that complainant has not proved himself to be the son and sole heir at law of the deceased owner of the real estate in controversy, and that the bill must be dismissed.

Action to Settle Adverse Claim.

*S. L. Pierce*, for complainant.

*R. B. Galusha* and *Young & Lightner*, for defendant.

NELSON, J. This action is brought under the statute of Minnesota, (Rev. St. c. 75, § 2,) by a citizen of the state of Nebraska against a citizen of the state of Minnesota, to settle an adverse claim to certain real estate in the county of Ramsey, in this district, described in the bill of complaint as follows:

"Lot numbered one (1) of section numbered five, (5,) in township numbered twenty-eight, (28,) of range numbered twenty-three, (23,) containing fifty-two and fifty-six one-hundredths acres (52 56-100) of land; also the west half (W. ½) of the south-east quarter (S. E. ¼) of section numbered thirty-two, (32,) in township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing eighty acres; also the north-east quarter (N. E. ¼) of the south-west quarter (S. W. ¼) of section numbered thirty-two, (32,) in township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing forty acres; also lot numbered one, (1,) in section numbered thirty-two, (32,) township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing twenty-nine and seventy hundredths acres, (29 70-100;) also lot numbered two, (2,) in section thirty-two, (32,) in township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing thirty-one and 20-100th acres, (31 20-100;) also the south-west quarter (S. W. ¼) of the north-west quarter (N. W. ¼) of section numbered thirty-two, (32,) in township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing forty (40) acres; also the west half (W. ½) of the south-east quarter (S. E. ¼) of the north-west quarter (N. W. ¼) of section numbered thirty-two, (32,) in township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing twenty acres; also the north half (N. ½) of the south-west quarter (S. W. ¼) of section numbered one, (1,) in township numbered twenty-nine, (29,) of range numbered twenty-three, (23,) containing eighty acres; all of said real estate situate in Ramsey county and state of Minnesota; also the west sixty (60) feet of lot four, (4,) and the south third (⅓) of lot numbered three, (3,) in block numbered six, (6,) of Rondo's addition to the city of St. Paul, in said county of Ramsey; also a strip of land north of Pearl street, west of Joel Whitney's addition to the city of St. Paul, continued northerly to a point to intersect at Jackson street, and east of said Jackson street, in the city of St. Paul, in said county of Ramsey; also lots numbered twelve, (12,) thirteen, (13,) fourteen, (14,) and fifteen, (15,) Prince & Denoyer's rearrangement in the city of St. Paul, in said county of Ramsey. All of which said real estate is of the value of seventy-five thousand dollars."

The complainant claims to be the owner in fee, and sole heir at law of Stephen Denoyer, who died intestate, December 3, 1877, possessed of the real estate in controversy, which was distributed by the probate court of the county among his brothers and sisters and

nephews and nieces and widow surviving him. The defendant obtained the title vested under the decree of distribution by the purchase of part of the property from the heirs to whom it was distributed, and a part from their grantees. The claimant seeks to quiet and settle his claim to the parts assigned to the brothers and sisters and nephews and nieces of the intestate by virtue of the statute, as sole heir, alleging that he is the legitimate son of the intestate, Stephen Denoyer, and that the land is vacant and unoccupied. The defendant admits that the land is vacant, but denies that the complainant is the legitimate son and sole heir at law, and sets up the decree of distribution as a bar to this suit. A replication is filed; and voluminous testimony is taken in the United States and in Canada. The questions of fact and law are very thoroughly presented. I will first consider the facts at issue.

The complainant's testimony is chiefly hearsay, and consists of the declarations and admissions of the intestate, Stephen Denoyer, that the claimant is his son, and also the declarations of aged members of Stephen Denoyer's family, who were incapable of being examined on account of the infirmity of age. It also includes the testimony of other members of the family, of facts and circumstances tending to sustain his claim. The claimant is examined in his own behalf, and gives a long narrative of himself, and his discovery that he was the intestate's son, and the account given him of his birth by Stephen Denoyer. The relation of Stephen Denoyer to the witnesses whose declarations are testified to, and other facts connected with his history are conceded. Etienne or Stephen Denoyer was born in St. Phillippe, in the district of Montreal, Canada, April 21, 1805. He was the son of Etienne, of the same place, who had two brothers, Antoine and Andre. Stephen Denoyer, during his boyhood, moved to St. John, 12 miles distant from St. Phillippe, where his uncle Andre lived, and about 1827 left his home, and for 23 years his mother and sisters and family did not hear from him, and supposed he was dead. There is no direct and positive evidence of his whereabouts until 1839, when he was living in the state of Illinois, at Prairie du Rocher; and in 1841 was there married, and removed, in 1842, to Dubuque, Iowa, where his wife gave birth to a child, and mother and child both died. During the same year he removed to and settled in Wisconsin,—now Minnesota,—and from that time until his death kept the Half-way House between St. Paul and the present city of Minneapolis. He was married in St. Paul in 1845, and again in 1873. Evidence of these marriages are introduced, the ceremonies being performed by a priest of the Roman Catholic Church.

The complainant claims that previous to Stephen Denoyer leaving Canada, or about that time, he married a woman, whose name and family are unknown, and that he is the legitimate offspring of this marriage, being born in Troy, New York; that his mother died in giving him birth, and he was taken to Antoine Denoyer, Stephen's

uncle, to be raised, who paid the former $200 a year until he was 14 years old.

Briefly, then, his evidence can be summarized: The complainant testifies "that he was brought up in the family of Antoine Denoyer, of St. Phillippe, Canada, and first discovered that his father was Stephen Denoyer, of Minnesota, in 1853 or 1854, when he was 16 or 17 years of age. He was recognized in the family and treated as a son of Antoine until that time, when, in a conversation with Antoine, he discovered that he was not his father. The discovery was made when the plaintiff had incurred the displeasure of Antoine, and was punished by him; and on the assertion by a neighbor that he was not Antoine's son, he made inquiry, and was informed that he was the son of Stephen Denoyer, of St. Paul. The complainant left his home, and started to visit Stephen in Minnesota, where he arrived in June or July, 1856, and entered his saloon unknown, and introduced himself, and became a member of the family. In the saloon one night he asked where his mother died, and Stephen Denoyer said, she died in giving him birth in Troy, New York, and that he took him to Antoine Denoyer to be raised, and he paid him $200 a year for his keeping until he was 14 years old."

It is conceded that the complainant was brought up in the family of Antoine, and lived with him until he was 16 or 17 years old, as his son, and recognized as such. Antoine Denoyer was twice married, and had a large number of children by each wife. The last wife was Marie Gervais, and she and Antoine are still living, but mentally infirm, and not capable of giving their evidence.

The principal testimony upon which complainant relies is his own evidence of the declarations of Stephen Denoyer, and the evidence of other witnesses to whom Stephen Denoyer introduced him as his son, or his boy; and the evidence of one or two witnesses to whom it is claimed Stephen Denoyer gave an account of his birth, and declared him to be a son. It is true, there are hearsay declarations and evidence of members of Stephen Denoyer's family, and vague rumors and surmises of a mysterious relationship existing between the claimant and Stephen Denoyer, but they are not of sufficient weight to be considered in determining the issue.

The complainant's case would be established pretty clearly if there were no record evidence countervailing the theory advanced by him. The hearsay testimony of aged and deceased members of the family is very proper and admissible in suits of this kind, and it is allowed from the necessity of the case; for in many instances it is the only evidence possible to establish pedigree and consanguinity. In fact, anything which affords reasonable grounds of belief is competent to be considered to establish relationship; but loose declarations and expressions implying heirship, uncertain in their character, have not much influence in determining such relationship. The reliance placed upon this kind of evidence depends upon the circumstances attend-

ing the declarations, as well as the knowledge that the declarant is supposed to have possessed of the matters spoken of. Aside from the claimant's testimony, and that of one or two others, the evidence is made up of casual conversations in Stephen Denoyer's saloon 30 years ago, between the latter and acquaintances who stopped in passing his place; and while their recollection is indistinct upon most of the matters in these conversations, they are clear that Stephen introduced the claimant as his son or his boy. The complainant at that time was a lad of about 17 or 18, and is now a mature man of 47 or 48 years of age; but the witnesses generally testify as to his identity with the boy of 17 or 18 years, and some of them swear as to personal resemblance and similarity of character between the claimant and Stephen Denoyer. None of these frequenters of the "Half-way House" had seen the claimant until recently for a period of 30 years, and had only noticed the boy at the house once or twice.

If there was no evidence in opposition to the claim, it might be, perhaps, a fair deduction that the claimant was a son of Stephen Denoyer's, and as there are no other relatives who could take the estate but those to whom it was distributed by the probate court, the facts would establish his claim, and might justify a decree. Some of the complainant's witnesses are evidently mistaken, however, in relating the conversation and declarations of Stephen Denoyer, in which they state he spoke of having a son, and that he afterwards introduced the claimant as such. I shall not particularize; it is quite apparent by a glance at the testimony; for, by some of the witnesses Stephen Denoyer is reported to have talked about matters, and to have narrated domestic affairs which the record evidence shows to have been untrue, and no possible motive existed for such misrepresentation by him.

The theory of the defendant is that the claimant is the son of Antoine Denoyer, and cousin of Stephen. The complainant, while living with Antoine, was called Isaie, and some times John, and he brings this suit by the name of George Isaie, under which name he was married. The defendant urges that the claimant's true name is Jacques Isaie Denoyer, born in September, 1836, of the legitimate marriage of Antoine Denoyer and Marie Gervais. In proof of this they produce evidence which shows that there was only one child brought up in the family of Antoine called Isaie, and it is undisputed that the claimant was that child; and, furthermore, the parish register of St. Phillippe is introduced, and an entry appears therein as follows:

"On the seventeenth day of September, one thousand eight hundred and thirty-six, by us, as priest, undersigned, has been baptised, under condition, Jacques Isaie, born this morning of the legitimate marriage of Antoine Denoyer, farmer, of this parish, and of Marie Gervais. The god-father was Joseph Hebert, the god-mother Julie Bourdon, who, with the father present, could not sign.

[Signed]                                              "PIGEON, Priest."

The parish register is usually the best source of evidence in cases of this character. This entry was required to be made by the law of Lower Canada, and the effect of the record is defined by the "Acts of Civil Status," in force in 1836. It is in Canada the authentic evidence of birth and baptism. While this entry will not have equal weight in this court as evidence of the facts therein stated by the priest, and represented by him as declared by the persons presenting the child for baptism, it is admissible to prove that a child of Antoine Denoyer and Marie Gervais was presented for baptism, and was named Jacques Isaie. It was the duty of Antoine Denoyer, when the child was presented for baptism, to declare the day of birth, and the names and occupation, etc., of the father and mother, and it was the duty of the priest to make the entry. The parents, if present, and sponsors were required to sign the record, and if any of them could not sign their names, mention of that fact was required by law to be made in the entry. This record, therefore, raises a presumption that the Isaie who lived with, and was brought up in, the family of Antoine, was his legitimate offspring, and overcomes all the oral evidence of witnesses of the declarations and admissions of Stephen Denoyer and others. It is true, there are two records of baptism: one an entry which was made in the parish register, and the other a duplicate required by law to be filed in the prothonotary's office of the supreme court of the district of Montreal; and there is a difference between them in the date given when the child is stated to be born and presented for baptism. I do not think this difference is of much importance. The fact required to be established is the identity of the claimant, who lived in Antoine's family, with the child presented for baptism, and this certificate of entry is evidence of that fact.

The complainant's solicitor urges that the evidence fails to show that Isaie was ever called Jacques. One of the sons of Antoine testifies that he had a brother Jacques Isaie; but his evidence, taking into consideration the circumstances when given, perhaps, without this record, would have little weight, but in connection with the entry it must be considered as evidence tending to establish the fact that there was a son of Antoine's by the name of Jacques Isaie. The claimant had several Christian names; a familiar one was John. New Christian names are acquired arbitrarily; nick-names are frequently given, and sometimes names are assumed or fixed by an effort to Anglicize a French name. Jacques might very easily be pronounced Jack, which in English is the diminutive of John; so that, although the complainant in his testimony states that the name of John was given him while at work in a brick-yard, in Troy, New York, when he was about 16 years of age, it is not improbable that it was effected in this manner, and the explanation is not inconsistent with his statement. This, however, is not very important, for, as I said before, the fact to be established, and which the defendant endeavors to prove, is that the plaintiff is Antoine's son.

There is more written evidence introduced by the defendant. Letters are produced, written at the instigation and dictation of Stephen Denoyer to his uncle Antoine, in answer, it would seem, to inquiries about his son Isaie, who had gone to Minnesota. In these letters Stephen speaks of the claimant as Antoine's son; and further, a letter from claimant is introduced, written in 1858, while he was with Stephen Denoyer, in Minnesota, in which he addresses Antoine and Marie Gervais as his dear parents, and subscribes himself as their devoted son. And, in addition, there is introduced a written contract, executed in 1854, between Antoine Denoyer and the claimant, in which the latter represents himself as the son of Antoine. These admissions in the contract and in the letter are made after the alleged discovery by complainant that he was not Antoine's son, and at a time when he left his home to go and live, as he claims, with Stephen as his father. In his letters to Antoine the claimant does not speak of Stephen as his father, and does not intimate that he was recognized as a son, but expresses the affection of an absent member of the family for his parents.

It is not necessary, in my opinion, to examine the testimony further; for, after full consideration, I find that the claim of the complainant is not sustained by the evidence. It is not necessary to determine the effect of the decree of the probate court.

The bill of the complainant is dismissed, and a decree will be entered accordingly.