PAGE et al. v. ATKINS.

No. 12769—Opinion Filed April 25, 1922.

Rehearing Denied July 11, 1922.

(Syllabus.)

1. Indians — Allottee — Identity — Evidence—Enrollment Records.

Under the act of Congress of June 28, 1898 (30 Stat. 502, c. 517, sec. 21), the Commission to the Five Civilized Tribes was authorized and directed to make correct rolls of the citizens by blood of the tribes and in making such rolls to make them descriptive of the parties thereon so that they may be thereby identified. The commission was given access to the rolls and records of the several tribes in preparing the rolls of the citizens of the tribes. Held, the enrollment record of the commission made pursuant to the act of the Congress, considered as a whole, which discloses the identity of an enrolled citizen, is conclusive evidence as to the identity of such citizen in the absence of clear, unambiguous, and convincing countervailing evidence clearly establishing error or mistake.

2. Same—Conclusiveness of Decree of Commission to the Five Civilized Tribes—Enrollment of Indians.

The Commission to the Five Civilized Tribes was a quasi judicial tribunal on which the Congress by act of June 28, 1898, 30 Stat. at L. 495, c. 517, and the Creek Agreement of March 1, 1901, 31 Stat. at L. 861, c. 676, imposed the duty of making in-

vestigation and determining the names of those entitled to be enrolled as citizens and entitled to participate in the division of the tribal lands, and a decree of the commission, denying an applicant the right of citizenship as a member of a tribe, which decision was affirmed by the Secretary of the Interior, is conclusive against such applicant to citizenship as a member of one of the tribes. United States v. Wildcat et al., 244 U. S. 111. 61 L. Ed. 1024.

### 3. Ejectment—Recovery—Title of Plaintiff.

In an ejectment action the plaintiff must recover on the strength of his own title, and not upon the weakness of the title of his adversary.

### 4. Appeal and Error—Reversal—Directions to Trial Court.

Where from a consideration of all the evidence in the record it is apparent that the plaintiff is precluded from recovering in the action on the reversal of the judgment rendered by the trial court, this court will direct that judgment be entered in favor of the defendants against whom the action is prosecuted.

Error from District Court, Creek County; Lucien B. Wright, Judge.

Stuart, Sharp & Cruce, West, Sherman, Davidson & Moore, Ellinghausen & Ellinghausen, H. O. Bland, Paul P. Pinkerton, and Rice & Lyons, for plaintiffs in error.

McDougal, Lytle, Allen & Pryor, Harry G. Davis, J. D. Simms, and Gibson & Hull, for defendant in error.

KENNAMER, J. The plaintiff, Sallie Atkins, commenced this action against the defendants, Charles Page et al., in the district court of Creek county on the 19th day of May, 1920. The cause of action pleaded by plaintiff in her petition was an action in ejectment. In the first paragraph of the plaintiff's petition it is alleged she is the owner of the fee-simple title, legal and equitable estate, in and to the lands described in the petition. That Thomas Atkins, as a citizen of the Creek Nation or Tribe of Indians enrolled opposite roll No. 7913, was by the Commission to the Five Civilized Tribes on or about May 23, 1901, allotted the lands described in the petition as his share of the lands belonging to the Creek Tribe of Indians. That on the 14th day of April, 1903, patents or allotment deeds were issued and approved May 8, 1903, by the Secretary of the Interior and recorded in the office of the Commission to the Five Civilized Tribes on the 16th day of May, 1903. That the allottee, Thomas Atkins, died intestate, unmarried, without issue and without surviving father on the —— day of ————, 190—, leaving as his sole and only heir at law his mother, the plaintiff, and the plaintiff, as sole and only heir of the said Thomas Atkins, deceased, acquired the legal and equitable title in fee in the lands allotted to Thomas Atkins. That the defendants had been in the wrongful possession of the lands allotted to Thomas Atkins, deceased, since sometime in the year 1913, claiming an interest and estate in said lands adverse to the plaintiff. That neither of the defendants has any interest in the lands. That the defendants, while in the wrongful possession of the land, have operated, and are operating, said land for oil and gas and have extracted and removed from the land wrongfully, illegally, and unlawfully oil and gas to the value of $2,500,000. Plaintiff prayed the judgment of the court for possession of the land and damages.

The defendants, Charles Page et al., filed an answer, denying all the material allegations of the plaintiff's petition. In the second paragraph of the defendants' answer they specially plead the judgment of the United States Commission to the Five Civilized Tribes, approved and confirmed by the Secretary of the Interior, adjudging the person through whom the plaintiff claims title and who is referred to in the plaintiff's petition by the name of Thomas Atkins and alleged to have been a son of the plaintiff, died prior to the first day of April, 1899, was not and could not have been enrolled as a citizen of the Creek Nation or Tribe of Indians or allotted the lands sued for in plaintiff's petition or any of the lands of the Creek Nation, and attached a copy of the order of the commission as an exhibit to their answer.

In paragraph 3 of the defendants' answer they specially plead a judgment and decree of the district court of the United States for the Eastern district of Oklahoma entered in an action wherein the United States of America was plaintiff and Minnie Folk, nee Atkins, Charles Page, et al., were defendants, whereby it was adjudged and decreed that the lands involved in the action were allotted to Thomas Atkins. the son of Minnie Atkins, otherwise Minnie Folk, and alleged that said judgment forever bars and estops the plaintiff herein from any recovery.

The fifth paragraph of the defendants' answer admitted that the defendants had possession of the lands in controversy and alleged that the lands were allotted to Thomas Atkins, enrolled opposite No. 7913, who died intestate on or about the ——— day of ———, 190—, leaving as his only heir at law his mother, Minnie Atkins, or Minnie Folk, and deraigned their title under conveyances executed by Minnie Atkins as the only heir of Thomas Atkins, the deceased allottee; alleging that the defendants had been in the uninterrupted and peaceable possession of the lands since July, 1914, and they had expended in good faith in the development, operation, and improvement of said property the sum of $566,507.-59 and had expended in good faith for the purchase of the asserted claim of the Gypsy Oil Company the sum of $20,000; that the plaintiff had with full knowledge and notice, or full and ample opportunity to have notice thereof, stood mute and given no intimation, notice, or warning of any claim, or the assertion of any claim, on her part that she had any interest in the property, and that by reason thereof she is estopped by her neglect and laches from any relief.

The plaintiff filed a reply, denying the material allegations of the answer; denying that the judgment of the Commission to the Five Civilized Tribes pleaded in the second paragraph of the defendants' answer is a bar to the recovery in the action, for the reason, previous to the attempted consideration of the right of Thomas Atkins to enrollment as a citizen of the Creek Nation of Indians, the commission had already, on the 23rd day of May, 1901, entered a judgment enrolling the said Thomas Atkins.

Upon the issues made by the pleadings the trial of the case was commenced on the 24th day of March, 1921. The parties having stipulated in open court that they waived a jury trial, all of the issues of law and facts were submitted to the court. The court on the 31st day of March, 1921, having heard the evidence and argument of counsel, found the issues in favor of Sallie Atkins, the plaintiff; that she was the mother of Thomas Atkins, enrolled by the Dawes Commission May 23, 1901, opposite roll No. 7913 on the approved rolls as a Creek citizen, the deceased allottee of the lands, and as the sole and only heir was the owner of the legal and equitable title to the land in controversy; decreed that the plaintiff take judgment against the defendants and each of them to quiet her title to the lands, and for possession thereof; ordered the defendants to render an accounting of the proceeds from all the oil, gas, and casing-head gas extracted from the premises within ten days. The defendants each excepted to the findings and conclusion of law entered by the court in his decree.

Thereafter, upon the defendants filing an accounting of oil, gas, and casing-head gas extracted from the premises and upon the exceptions filed by the plaintiff, the court entered judgment in favor of the plaintiff and against the defendants for the sum of $1,960,000. The motion of the defendants for a new trial was overruled, and from the judgment and order denying the defendants a new trial this appeal is prosecuted by defendants to reverse the judgment of the trial court. Numerous errors are assigned as grounds for a reversal of the judgment.

The record in this cause is voluminous and the controverted questions have been extensively and thoroughly briefed by counsel for the respective parties. The cause was orally argued at length. The issue to be determined by this court is conceded by both parties to involve but one single question; that is, the identity of Thomas Atkins, enrolled opposite roll No. 7913 as a member of the Creek Tribe of Indians. The plaintiff contends that his mother was Sallie Atkins, and the defendants denying this contention and asserting that his mother was Minnie Atkins. The plaintiff contends that the action was a law action in ejectment, and the trial court having found the issue in favor of the plaintiff, this court is concluded by the findings of the trial court, for the reason defendants failed to demur to evidence of plaintiff or move the court for judgment.

The defendants contend that the judgment is not reasonably supported by the evidence. Second: That the enrollment record designating Thomas Atkins, the allottee, to be the child of Minnie Atkins, is a conclusive identification of the allottee. Third: The record disclosing that the Commission to the Five Civilized Tribes upon the application of Sallie Atkins for the enrollment of her son, Thomas Atkins, being denied, the decree is conclusive against his right to an allotment of land in the Creek Nation. The parties will be referred to as they appeared in the trial court.

It is conceded by counsel for the parties that Thomas Atkins, enrolled opposite roll No. 7913 as member of the Creek Tribe of Indians by the Commission to Five Civilized Tribes on the approved rolls, was the same person as appeared on the authenticated Euchee Roll of 1895. The plaintiff,

Sallie Atkins, contends that the Thomas Atkins appearing on this Euchee Tribal Roll was her son. The defendants deny this contention of the plaintiff and assert that the Thomas Atkins appearing on the Euchee Tribal Roll was the son of Minnie Atkins. While the evidence introduced in the trial of the cause is voluminous, it is clear from an examination of the record that there are certain enrollment records and tribal rolls, when considered in connection with the admitted facts, that are conclusive of this cause.

In considering the tribal rolls necessary to a determination of the controversy presented, it is important to notice the manner of making these records. The Creek Nation was composed of civilized bands, clans, or tribes of people. There existed 47 different towns in the Creek Nation. Each of the towns had a town king or chief. This king was the leading citizen of the town, and it was his duty to always be active in matters pertaining to the general welfare of the town or clan he presided over. The Creek government for the Creek Nation was administered by a Council, composed of House of Kings, House of Warriors, and Principal Chief. After the sale of the lands in Western Oklahoma belonging to the Creek Indians they had about $2,000,000 to their credit. By resolution of the Creek Council a per capita payment was approved. By order of the Council the various towns were requested to take a census. The town king of the respective towns proceeded to the taking of the census or the enrolling of the members of the different tribes.

Noah Gregory was the town king of Euchee town about the year 1890, and as such town king called a meeting for the purpose of making up the census or roll of the members of the Euchee Tribe. He stated in his evidence that there were about 400 people at this meeting. That the members of the House of Kings and of the House of Warriors from this tribe attended, also all the old leading citizens. That Sam Brown, who had been a member of the House of Kings, was secretary of the meeting. Gregory identified a book which Jackson Barnett gave him and requested him to make a census of the Euchee Indians. In this book the 1890 Euchee census was made. From this book Gregory copied the list of names on a roll, which was presented to the Creek Council for approval. The Council selected a committee of 16 to examine the list and report on it back to the Council, and after a full investigation and consideration of the list of names reported the names approved constituted the mem-

bers of Euchee Tribe. On this roll of names appeared Minnie Atkins and two children.

Sam Brown, who was for a number of years town king of Euchee town and acted as secretary of this meeting, testified by deposition. The material part of his testimony is as follows:

"Q. What is your name? A. Samuel W. Brown. Q. Are you a member of any tribe of Indians in this state, Mr. Brown? A. Yes, sir. Q. What tribe? A. Euchee Indians. Q. Are you enrolled as a Euchee? A. Yes, sir. Q. And allotted as such? A. Yes, sir. Q. Did you ever hold any official position with the Euchee Tribe of Indians? A. Yes, sir. Q. What was it, Mr. Brown? A. Town king, they call it; town chief or town king. Q. Town king. When were you town king of the Euchee Tribe? A. When? Q. Yes, what year? A. I have been king ever since 1867. Q. Ever since 1867. Were you ever a member of the Creek Council? A. Had to be. Q. What house did you sit in? A. Kings. Q. House of Kings? A. Uh-huh. Q. Mr. Brown — — A. Yes, sir. Q. Is the Euchee language the same or different from the Creek language? A. Just as much different from the Creek language as the Japan or German or Osage. Q. Did you know Thomas Atkins, old Thomas Atkins? A. Yes, sir. Q. Of what town was he a member, if any? A. Thomas Atkins? Q. Yes. A. The old man? Q. Yes. A. He was Coweta. Q. Coweta; did you know any of his children? A. Yes, sir. Q. Did you know Minnie Atkins? A. Yes, sir. Q. What relation was Minnie Atkins to old Thomas Atkins? A. That was her father. Q. Her father. Was Minnie in the Euchee or the Coweta township? A. She was in the Euchee. Q. How came she to be in the Euchee town? A. Well, the reason, we don't give up our town people, even if they are married to another town, we still hold them unless it was consented to by the town kings and agreeable, was the only way they would give them up. Q. Was Minnie enrolled as a Euchee? A. She was a Euchee. Q. Did Minnie have any sisters? A. She had one to my knowing. Q. What was her name? A. Nancy. Q. Nancy; did she have any brothers? A. She had one, Lee. He died, got killed. Q. Lee Atkins. Mr. Brown, as an officer of the Euchee Tribe of Indians, did you have anything to do with making up the roll of 1890 for the Euchees? A. Yes, sir. Q. Who was the Euchee Chief at that time? A. Noah Gregory, N. G. Gregory. Q. Do you remember anything about a mass meeting being called about that time? A. Yes, sir. Q. Where was this mass meeting called? A. I think it was on Polecat. Q. On Polecat creek? A. Polecat creek. Q. Do you know whether there were many Euchees present at that town meeting, or at that mass meeting? A. I think there were some three or four hundred, or five hundred. Q. Do you know

how many people were enrolled in the Euchee Tribe, how many adults, grown people? A. I kind of forget, but there was over five hundred. Q. Over five hundred. What occurred at that mass meeting with reference to enrollments? A. About Minnie? Q. Yes, about Minnie and her family. A. Well, do you want to know about Minnie? Q. Yes. A. Well, there was a man by the name of Jackson Barnett, he got up and said that Minnie had two children. Q. All right, go ahead. A. You want me to keep on? Q. Just keep on and tell what occurred there. A. Well, I thought you — — well after he said that, he said Thomas Holder here is married to Minnie's half-sister, Calie Holder — —

"Mr. West: It is really Katie, your Honor, it should be Holden instead of Holder, to correct it.

"(Continuing reading:) A. — is married to Minnie's half-sister, Calie Holter, and therefore he said they had been corresponding, so that she had two children, but he said, 'I had left my letter.' He forgot his letter, he was a kind of a sick kind of a fellow, and then they left that to the convention what to do with it, whether to take them in or to just drop it. They was talking that way, and I said - - I got up, I was the clerk, I told them that we better just to enroll them two children; if the Council objects to it, why, of course, they couldn't blame me or any of them, so we did that. They all agreed upon that and they took them in, Minnie and two children. Q. Was that what was known as the 1890 Euchee Census Roll that you were making? A. Yes, sir. Q. Well, after you made the roll and put Minnie there with two children, what did you do with the 1890 Roll, your census roll? A. Well, we turned it into the Council. Q. Into the Council. What did the Council do with it? A. Dawes Commission got it. Q. What did the Council do with the roll? A. After they took it? Q. Yes. A. They took it because there had to be a set of commissioners appointed to look over every roll. Of course, near certain towns I think they held, they had to look over the roll to see whether it was correct or right. Q. Yes. A. And so the committee agreed to report just the same as we had reported, and they reported just the same and the Council adopted it. Q. The Council adopted it. Were the words, "Thomas and Mary" on there at the time it was adopted? A. No. sir. Q. Not there. Were those words put there in your handwriting? A. No, sir; they never put Thomas's name, nothing down there. Q. Now, Mr. Brown, did you have anything to do with making up the roll of 1895? A. Yes, sir. Q. Please state what was done then with reference to Minnie's family. A. Why, we took the census on that 1440 payment, 1895, and I was there, town king, and I took the census myself. Q. Did you pass that census roll into the Council? A. Yes, sir. Q. Did that census roll purport to have any of Minnie's children on it? A. Yes, sir. Q. What was done with that roll by the Council? A. They adopted it. Q. They adopted it. Were you present at the 1895 payment? A. Yes, sir. Q. Creek payment? A. I was there. Q. Do you remember whether or not you saw Minnie Atkins there? A. She was there. Q. Who was in charge of the payment? A. A man by the name of N. B. Moore. Q. Napoleon B. Moore? A. Yes, sir. Q. Do you remember whether Mr. Moore's wife was there? A. She was there. Q. Did you draw any money for any Indians at the payment? A. Yes, sir. Q. For whom did you draw? A. I drew for several. Q. Well, any of Minnie's family? A. Oh, Minnie — I didn't draw any of Minnie's, her own children herself — — Q. I mean the family, however. A. Oh, the family. I drew for Ed Schrimsher, also Nancy, Nancy Davis, also John Davis. Q. John Davis. A. He wasn't there. Q. Did Minnie draw her money? A. Yes, sir; she drew her money. Q. Do you remember, or do you know from your own memory how many she drew for? A. Four. Q. Herself and three? A. Yes, sir. Q. Three children. You may state what the duty of a town king was with reference to making that census and finding out the membership in the tribe, what was his duty? A. He is boss for the whole town, you might as well call it; he is the king, and he does all the looking after the people, the constituents; not only that, why, such as like this, payment like that, he is the one that is assigned to them to take the census. He is responsible; responsibility rests upon him. Q. Yes. Mr. Brown, do you know whether or not the Euchees ever admit into their membership of their tribe any person of negro blood? A. Is that the question? Q. Yes, sir. A. No, sir; they never have. That is one thing that was forbidden fruit among Euchee Indians, to allow any other tribe, or belonging to any other tribe, to — — Q. Now, you are trying to say that the Euchees had a fixed rule not to admit persons — — A. Belonging to any other family. Q. Of negro blood, or from any other township or tribe? A. Or tribe; that is, ever since I have known them. I will state there, they might think we had. John Buck was mixed, so they will know. Q. What is the name, John what? A. John Buck. Q. Now, do you know whether or not that is the only family that you know of that was ever admitted into the Euchee Tribe whose blood was tinctured? A. Yes, sir."

The payment for 1890 appears to have been for $29. A payment of $14.40 was made in 1895. Prior to this payment the census of the tribes was revised. Minnie Atkins appeared on this 1895 revised Euchee roll with her children; one of them being Thomas enrolled opposite No. 213. The payroll of the Euchees shows that Minnie received the

per capita payment for Thomas of $14.40 and receipted for it on the payroll. The undisputed testimony of Mrs. Moore and Ellis Childers is to effect that Minnie received this payment for Thomas. The undisputed evidence in the record is to the effect that Minnie Atkins was a member of the Euchee Tribe of Indians.

The census card No. 2707 of Thomas Atkins contains the following information:

"Age—ten, Sex—Male, Blood—½, Father —White Man, Mother—Minnie Atkins, 1895 Euchee Roll, No. 1 being Thomas Atkins, on 1895 Auth. Roll No. 213."

It is admitted by both parties to this action and it is conclusively established by the enrollment records that the Thomas Atkins appearing on the old tribal Euchee roll is the one to whom the patent for the land in controversy is issued. Counsel for the plaintiff insist that these enrollment records showing Tommy to be the child of Minnie to that extent is merely erroneous descriptive matter. They insist that the testimony of Ed Schrimsher shows that the Tommy Atkins appearing on the Euchee tribal roll was the son of Dick or Richard Atkins and Sallie Atkins, the plaintiff in this action.

It is admitted that Dick Atkins was of African descent and was a slave in Missouri, and that Sallie Atkins, the plaintiff in this action, was a negro. There is no dispute about Sallie and Richard having a boy by the name of Thomas Atkins, but nowhere is there evidence in the record which shows that this negro named Tommy Atkins was ever placed on the Euchee tribal rolls. On the contrary, the evidence is overwhelming that he was never enrolled as a member of the Euchee Tribe of Indians. It is conclusively established by all the witnesses, including Schrimsher, that it would have been a violation of the custom of the Euchee Tribe to enroll a negro or citizen of part negro blood as a member of their tribe. The evidence shows also that a citizen was never enrolled with more than one tribe, and if he desired to transfer, he must get a certificate of transfer from his town king. Counsel for plaintiff in effect conceded that the testimony of Schrimsher is all they have tending to show that this negro Tommy was ever placed on the Euchee tribal roll. His evidence, in so far as it relates to placing this Tommy on Euchee tribal roll, is as follows:

"Q. Did you know Sam Brown, the chief of the Euchee town in 1895? A. I have known Sam Brown since I was 12 years old. Q. He was a Euchee Indian? A. Yes, sir; supposed to be. Q. And he had been one of the leading men of that town during all of your boyhood, had he? A. Yes, sir. Q. During the preparation for that payment and the making of the roll, did you ever take any steps toward enrolling yourself and other people in your family with Sam Brown? A. I did, at my Uncle John's request. Q. Your Uncle John Davis? A. Yes, sir. Q. Where did you see Sam Brown? A. I was on Main and Okmulgee at Muskogee. Q. At Muskogee? A. Yes, sir. Q. At Main and Okmulgee? A. Yes, sir. Q. In front of whose place of business? A. McDaniels. Q. Tom McDaniel's butcher shop? A. Tom McDaniel's old meat market used to be there. Q. Well, now, before going to Muskogee to give in the names of the family, state whether or not you had made up a list of the people whose names you were going to turn in? A. I was making up a list one morning preparatory to going down there. Q. Where was you? A. In the store; in the front end. Q. What took place while you were making that list? A. Dick Atkins came in. Q. What did he say, if anything, to you about enrollment? A. He come in and said, 'Good morning, Mr. Ed, what are you doing'? I says, 'I am making up a list to get some of that Creek money'; and he says, 'Where are you going?' I says, 'I am going down to Muskogee to see Sam'; he says 'Put my boy down'; I says, 'Which one?' and he says, 'Tommie'. Well, that was the only one I knew. I says 'All right'; and I just went on and finished. I says, 'Do you mean that?' and he says, 'Yes'; and he went on back to the back end of the store. Q. You say that Mr. Sam Brown was a cousin of yours? A. Yes, sir. Q. Was he on your mother's side, on the Davis side? A On my mother's side. Q. Well, now, did you meet Sam Brown in Muskogee when you went down there after making that list? A. Yes, sir. Q. And met him in front of this McDaniel place in Okmulgee? A. Yes, sir. Q. What name did you give him at that time, as the names of the people that you wanted him to put on the roll for that payment? A. Well, I gave him my name and Minnie Atkins and Charley and Harvey, Charley and Harvey Harrison. Q. Harvey? A. Harvey and Charley Harrison and Uncle John and the last name on there — — Well, I put Nancy's name first and Uncle John's last under that column and Thomas Atkins next. Q. Is that the Thomas who you said had been spoken to you about by Richard Atkins as Dick Atkins' boy? A. That is Dick Atkins' boy, Thomas Atkins. Q. You turned that name in to Sam Brown on that date? A. Yes, sir. Q. You turned the names of Harvey and Charley, Nancy and John Davis in? A. And Thomas Atkins. Q. Yes, sir; and Thomas Atkins? A. Yes, sir. Q. You didn't claim any relationship with this boy Thomas, did you? A. No, sir; I didn't think I was any relation to him. Q. They didn't claim any relationship with you? A. No, they didn't. Q. They claimed they were related to old man

Thomas Atkins in some way? A. I never did hear him say; I heard Nancy; Nancy told me they kind of claimed kin with her. Q. Well, now, you knew Nancy Atkins very well at that time, didn't you? A. Yes, sir. Q. And where did she live? A. She lived on the West side, among the coons. Q. Among the coons? A. Yes, sir. Q. What was the conduct that she was usually supposed guilty of; was she behaving herself or did she lead a rather bad life? A. Well, supposed to be bad life. Q. Born dead; well, now, did you know Minnie Atkins at that time? A. Yes, sir. Q. Along in the spring of 1895? A. Yes, sir. Q. When did you see her before you went to see Sam Brown at Muskogee? A. When did I see Minnie? Q. Yes, when had you seen her last before you went down to see Sam Brown? A. I don't think I had seen her when I went down to see Sam Brown. Q. Did you see her subsequently to that time? A. I saw her after that. Q. Did you have any conversation with her about the number of children that she had? A. Yes, sir. Q. What number did she say that she had had? A. She said she had three. Q. Did she tell you whether they were boys or girls? A. She said two was boys and one was a girl and that she died in Colorado. Q. That is, the girl child died in Colorado? A. Yes, sir. Q. Do you know the name she told you that the girl child had? A. I think she was —— I think she said it was Alice. Q. Alice? A. Yes, sir. Q. What were the names of the two boys? A. Charley and Harvey Harrison. Q. Charley and Harvey Harrison? A. Yes, sir. Q. Did you ever know those boys any after that, in after years? A. Yes, sir, I saw them several times. Q. When was the last time you recall to have seen him alive, about when did you last see him alive, about what year? A. Well, the last that I can remember seeing him alive was the latter part of '99. Q. Then going back to the writing of those names in 1895, the time that Richard Atkins asked you to, that is, Dick Atkins asked you to put his son Thomas' name in, when you saw Mr. Brown at Muskogee following it, in what way did you give him the information as to the names that you wanted placed on the Creek roll? Did you give him that written slip, in other words, or did you read or tell the names to him? A. I think I handed it to him and he copied them off. Q. Do you know what he copied them in or on? A. I believe it was a little pocketbook, a little book he got out of his pocket. Q. A book he took out of his pocket. Did you have any other conversation with him at that time as to the identity of the people whose names you gave him? A. I told him that Thomas Atkins was some of his kinfolks I thought he gave me the names to give to him? Q. Did he ask you who he was? A. Yes. Q. And you told him? A. I told him Dick Atkins' boy. Q. What did Sam say, if anything, to that? A. He said, 'He must

be kin to you too.' Q. You didn't really intend to tell Sam that Dick Atkins —— Judge Stuart: We object to that; that is leading. We object to it your Honor.

"Q. Did you intend that seriously or as a joke? A. No, he knew I was just joking. Q. You intended it as a joke? A. Yes, sir. Q. You say that after that time you talked to Minnie Atkins about the names of the members of her family? A. Yes, sir; I talked to her about it, asked her what family she had. Q. Did she ever in any of those conversations say anything to you about having a child by the name of Thomas? A. She told me she only had three children. Q. Susie —— A. Charlie, Harvey Susie. Q. Charley, Harvey and Susie? A. She didn't call her Susie, she called her —— Q. Alice? A. Alice. Q. You said Alice this morning, I made a mistake in Susie myself. It is written both ways ——

"Judge Stuart: He has already said it.

"Mr. Gibson: I understand, he said this morning ——

"Judge Stuart: Yes.

"Mr. Gibson: I was confused by my recollection of the rolls.

"Q. How long did Minnie stay around Wagoner at that time, as well as you now remember? A. Oh, I don't know; I think about 30 days. Q. You say she had told you she was then living in Colorado? A. She said she was living in Colorado when her brother died. Q. Now, Mr. Schrimsher, did you draw your money as a citizen of the Creek Nation in the 1895, $14.40 payment? A. I did not. Q. You never did get it at all? A. I never did get a cent of it. Q. Did you ever attempt to get that money after the payment was made? A. Yes, sir. Q. From whom did you attempt to get it? A. Sam Brown. Q. How did you happen to approach Sam Brown in regard to the payment of that money to you? A. I heard he drew it. Q. And you went to Sam and ask him for the money? A. Yes, sir. Q. Did he give it to you? A. No, he told me he sent it to me by Minnie. Q. Did you then see Minnie Atkins in regard to it? A. I saw Minnie. Q. Did she pay it to you? A. She said she didn't have it then, but she would give it to me. Q. Did you ask Minnie at that time what number of people she had drawn money for? A. She told me she drew for all she could. Q. Didn't tell you how many? A. No, she didn't say exactly. Q. Did you ever get that money? A. No, I never saw her any more then till I went to —— Q. To Leavenworth? A. To Leavenworth. Q. Where did you live in 1890? A. 1890? Q. Yes. A. Wagoner. Q. You went to Wagoner? A. Yes, sir. Q. Was John Davis there at Detroit at the same time you were? A. Yes, sir. Q. Were you and Davis taken there for the same thing? A. No, sir Q. What

was the trouble that you was sent there for? A. Grand larceny. Q. Grand larceny? A. Yes, sir. Q. When did you say you got back from up there? A. In '94. Q. In '94? A. Yes, sir. Q. You had been there how long? Q. I think about two years and five or six months. Q. So it was about '92 that you went there then, was it? A. I think it was about '92 somewhere. Q. Had you ever lived anywhere else up to the time you went up there, except Muskogee and Wagoner? A. Well, when I was a child I lived out in the Cherokee strip a while. Q. —— You were about 18 at 1890? A. Yes, sir. Q. Do you recall that there was a $29 payment in that year, don't you? A. I remember there was a $29 payment. I don't remember just exactly what year it was. Q. It was several years before the $14.40 payment. Answer that; the stenographer cannot see what motions —— A. It was prior to the $14.40 payment in '95, yes, sir. Q. Several years? A. I don't just remember exactly how many years, but some little time. Q. And you were living either in Muskogee or Wagoner at the time it was made. When did you go to Wagoner? A. I went to Wagoner in '91, and the payment was after that. Q. It was after that? A. Yes, sir. Q. You mean that $14.40 payment? A. No, sir, the $29 payment. Q. Wasn't the $29 payment in 1890? A. I don't know. I went from Wagoner to my brother's house to get the money. Q. And you didn't go to Wagoner till 1891? A. No, sir. Q. You think from that that the payment was made after 1890? A. I think it was. Q. What did you do when you first went to Wagoner? A. Run a meat market. Q. Had you ever known Richard Atkins before you went to Wagoner? A. No, sir. Q. How long had you been in Wagoner when you got acquainted with him? A. Well, I had been there about a year, I guess. Q. So you got acquainted with him about 1892? A. Yes, sir. Q. And you knew he had a large family, didn't you? A. I didn't know how large his family was. Q. Didn't you know any other members of his family or any of them besides this boy? A. I never met any of them; do you mean than this Thomas Atkins; I saw people they said was his folks, but I didn't have occasion to get acquainted with them. Q. Then you did see some other people there that were reputed to be members of his family? Yes, sir, I seen people that was reputed to be members of his family. Q. You saw Sallie Atkins, his wife, didn't you? A. I don't remember seeing her. Q. You saw the woman that purported to be his wife? A. No, sir, I don't remember about seeing her. Q. You don't remember about seeing her at all? A. No, Sir. Q. Did you know where Dick lived? A. I knew about where he lived. Q. Were you ever out to his place? A. No, sir. Q. Where was it that you were living at that time? A. On Grand river. Q. Where? A. West of Grand river, west of Wagoner, I mean west of Verdigris

river. Q. Did you know Gabriel Jamison? A. Gabriel Jamison; no, sir, I don't recall him to know him. Q. Don't you remember a man named Gabriel who sometimes represented the Arkansas town? A. I just heard of him. Q. You just heard of him? A. Yes, sir. Q. That settlement out there where these people lived was principally colored, wasn't it? A. I couldn't tell you. Q. You don't know anything about that? A. No, sir. Q. You never went out there? A. I had no occasion to; no, sir. Q. You knew Ellis Childers, didn't you? A. Yes, sir. Q. And you knew Napoleon Childers? A. Yes, sir. Q. And Anderson Childers? A. Yes, sir. Q. Where did they live from Wagoner? A. They lived northwest of town; that is, Cole Childers and Anderson. Q. Where did Ellis live? A. He lived across the river somewhere, I don't know just where. Q. Across what river? A. Verdigris. Q. On the other side of the Verdigris from Wagoner? A. Yes, sir. Q. Do you know how Dick Atkins got to be a citizen of the Creek Nation? A. No, sir. Q. Did he never tell you anything about that matter? A. No, sir. Q. When he talked to you about putting his boy Thomas on for the payment, did he speak to you about getting any other member of his family on? A. Not a soul; he knew I didn't know any of the other members of the family. Q. Did he say anything to you about getting him on? A. No, sir. Q. You didn't say anything to old man Brown about putting him on? A. No, sir. Q. Do you know, Mr. Schrimsher, what was the custom here in the Creek Nation, when they made up these rolls, about putting the members of the family together in one group? A. What do you mean? Q. The people that all belonged to the same family were usually put together? A. I suppose they would put them under their own family. Q. In their town? A. Yes, sir. Q. So that you know this same. Dick Atkins had a boy named Nathaniel Atkins, don't you? A. No, sir. Q. But you have heard of it? A. I don't know as I have heard the name particularly. Q. Did you ever hear that he had one named Ananias? A. I never heard him by name. Q. You never heard that name called? A. No, sir; I didn't hear it. Q. Never had any occasion to hear it? A. No, sir; I wasn't interested in it? Q. You say that you did find out that the people in Arkansas town were colored people? A. Yes, all of them, supposed to be. Q. All supposed to be colored? A. Yes, sir. Q. If the name of Thomas Atkins appears on the Arkansas town roll, that would indicate that he was a member of the colored race? Q. Mr. Schrimsher, I am showing you a certified copy of the Arkansas colored town omitted roll of 1890 or '91 at page 30, of the 1891 omitted roll. I will ask you if that doesn't show at the heading it is of the Arkansas colored town? That shows that Arkansas colored town at the head, does it not, Mr. Schrimsher? A. Yes, sir. Q. If

also shows that Thomas Atkins — — I will ask you what names appear on that as No. 44? A. Thomas. Q. Thomas what? A. Is this the ditto of that (indicating)? Q. Yes. A. Atkins. Q. Thomas Atkins? A. Yes. Q. And he appears there with what group of people extending from 40 to 45? Just read the names of that from 40 to 45, beginning with 40. Read them aloud. A. You want me to plead this case? Q. Yes; read it aloud. A. From 44? Q. Yes 40 to 45. A. Aleck Atkins, Nathan Atkins. Q. Nathaniel, isn't it? A. It is all scribbled up, I don't know what it is; Ananias, Naoma Atkins, and Lola. Q. You knew that the Thomas Atkins that you gave as you say to Sam Brown was a colored boy didn't you? A. Well, I always thought he was a little bit shaky. I didn't know particularly; I could not have sworn to it. Q. That is what you thought about it? A. Yes, sir. Q. You knew that he was not the child of either Minnie Atkins or Nancy Atkins? A. Yes, sir; I knew that. Q. Minnie Atkins and Nancy Atkins were both your cousins? A. Yes, sir. Q. Relatives of yours? A. Yes sir. Q. And yet you tell this court that you put that negro boy in with the same family list that you gave to Mr. Brown as for enrollment for the 1895 payment? A. I gave the name to Sam Brown; he was the chief. He is supposed to put the name where it belongs. Q. Then the list that you made up has nothing to do with where the name of that Thomas you gave in would go on the rolls that were made up? A. No, it didn't make any difference to me whether he put it on or not; I didn't care how he put it. Q. It didn't make a particle of difference to you? A. Not a penny. Q. It may, so far as you know, have been put on some other roll? You don't know where it appears on the Creek roll, do you? A. Not any more than you do. Q. You knew that Sam Brown was the town king of the Euchee town? A. Yes, sir. Q. And you knew that the Euchee town was an Indian town? A. Yes, sir. Q. And that you didn't put colored people on the Euchee town roll? A. I didn't think so. Q. What was your understanding of —. — — that was your understanding of the subject? A. Well, I never thought anything about it, but I naturally would not think so. Q. As a matter of fact you never knew any colored people being on the Euchee town roll or members of the Euchee town? A. No, not for a long time. Q. There never were but one or two people that had any of that blood in them, that ever were on the Euchree roll, was there? A. I don't know; I never did go to see the rolls. Q. You are still a member of Euchee town? A. Those days they were liable to do most anything. Q. The Euchees were Indians, weren't they? A. Supposed to be. Q. Supposed to be; and not darkies or negroes? A. Some might have been negroes; I don't know. Q. You lived here? A. Yes, sir. Q. And you knew about where the Euchee

people lived out there, didn't you? A. I knew they were scattered all over in the Creek Nation. Q. And a great many of them were up there about Duck creek? A. I knew some of them were on Duck creek. Q. That was an Indian town? A. I didn't think it made any difference where they lived, just so they belonged to the Euchee town. Q. I understand, but you knew the Euchee town in the Creek Nation was an Indian town? A. Yes, sir. Q. Aren't you a member of that race? A. I am on the Euchee town roll. Q. You are on the roll as a Euchee? A. I am on the Euchee town. Q. And so that by giving that name to Sam Brown you didn't give any directions about where the name should go? A. I never thought about where to put it; I supposed he knew his business. Q. And you supposed he would put it in the right place? A. Yes, sir. Q. You say that was done in 1894? A. No, sir; I didn't say. Q. 1894 or 1895, was it? A. 1895. Q. Well, the payment was made in 1895 and I didn't recall whether you stated you saw him before that year or not. A. It was in 1895. Q. It was in 1895? A. Yes, sir. Q. You know that they did have a roll here made up preparatory to that payment in 1895? A. Well, they were around every once in a while making rolls. Q. And whenever there was a payment made they got active about it? A. Generally. Q. I show you, Mr. Schrimsher, a certified copy of page 1 in the 1895 doubtful roll of Arkansas colored town; will you look at that and tell me what name appears against number 6 in the second group that is on there (handing paper to witness)? What do you say is the sixth name there? A. Tom. Q. What — — Tom what? A. Atkins. Q. Tom Atkins? A. Yes, sir. Q. Now will you read to the stenographer, Mr. Schrimsher, the names from 1 to 9 in that group? A. Mary. John. Q. Give the whole name. A. Atkins. Q. Mary Atkins? A. John, General, Nancy, Alec, Tom, Annie, Lawrence, Sherman. Q. I also show you, Mr. Schrimsher, page 24, certified copy of page 24 of the original 1895 omitted roll of the Creek Nation and will ask you if the fourth name on that list is not Thomas Atkins? A. Yes, there is another Thomas Atkins. Q. Another Thomas Atkins. Will you read the names from one to ten on there, among whom he appears? A. Alexander Atkins, Nathaniel, Manuel, Tommie, Viola, Henry, Aleck, Ananias and Lona. Q. Lona? A. Lona. Q. Do you know, Mr. Schrimsher, what sort of people made up the citizenship of Cheyaha town? Mr. Schrimsher, I show you the Cheyaha town, I show you the roll of Cheyaha town, Creek Nation, a certified copy of names not found on the Creek payroll of 1895, but attached to the 1895 payroll, and I will ask you if the name of Thomas Atkins appears on that roll. Do you find the name of Thomas Atkins on there? A. Yes, another one. Q. That is — — A. This is A-d instead of A-t. Q. This is spelled

A-d and the other is A-t. What are the other names from the top of the roll down to Thomas Adkins? A. They are all Adkinses. Q. Down to Nettie Childers? A. Lucy Childers, Mattie Childers. Q. What is the first name? A. Richard Adkins. Q. What is the next one? A. Alexander. Q. What is the next one? A. Nathaniel. Q. What is the next one?. A. Ananias. Q. What is the next one? A. Naomi. Q. What is the next one? A. Thomas. Q. What is the next one? A. Lola. Q. What is the next one? A. Birdie. Q. Mr. Schrimsher, you did not have anything whatever to do with making up the omitted roll of Arkansas colored town for 1891, did you? A. I never did have anything to do with making up of any roll. Q. At all? A. No, sir. Q. The only and the single function that you performed at all in connection with this matter, or what you say about the conversation you had with Richard Atkins and your giving those names there to Sam Brown in Muskogee? A. That is all. Q. Have you any knowledge at all of how these names of Thomas Atkins got on the various town rolls that I have been presenting to you? A. No, I didn't answer it. Q. Read the question to him? A. Answer it? Q. Yes. A. I suppose there was that many Thomas Atkinses. Q. In the Creek Nation? A. I guess so. Q. But you have no personal knowledge, that is a mere conclusion on your part, you have no personal knowledge of how many Thomas Atkinses. You have no personal knowledge about the matter at all? A. No, sir; I have not. Q. You never had anything to do with the making of either the 1890 payment of $29.00, if that was the year, 1890 was the year, the $29.00 payment, did you? A. No, sir. Q. You never had anything to do with any part of it? A. With any payment? Q. With the 1895 payment? A. No payment rolls. Q. Were you ever a member of either the House of Kings or the House of Warriors of the Creek Nation? A. No, sir. Q. You have never known any son of Minnie's by the name of Thomas Atkins? A. I never known — — Q. Did you know Minnie Atkins' father, Thomas Atkins? A. No. Q. Have you ever known any Thomas Atkins in the Creek Nation except this boy of Richard's, Dick Atkins? A. That is the only one I know anything about, Thomas Atkins. Q. The only one you ever knew anything about? A. Yes. Q. You never gave the name of any other Thomas Atkins to Sam Brown or any other officer of the Creek Nation? A. No. Q. And Minnie told you that the only children she had ever had was the two boys, Harvey and Charlie, and the girl Alice? A. Yes."

It will be observed that he nowhere testifies that this negro boy was placed on the Euchee roll. In effect, he said he turned his name into Sam Brown.

The testimony of Sam Brown was taken by deposition prior to this trial, and evidently counsel for plaintiff knew what Schrimsher was going to testify to, and it is a remarkably strange thing that astute counsel for plaintiff had the opportunity to examine Mr. Brown, who was in a better position to state than any living witness whether he placed this negro boy on the Euchee census roll of 1895, but waived cross-examination. Mr. Brown in his testimony positively stated but one man was ever placed on the Euchee roll of negro blood and that was one by the name of Buck, who he said got by them. Schrimsher states that this negro boy was not entitled to go on the Euchee roll and that he guessed Brown put him where he belonged.

While Schrimsher stated that Sam Brown took the names which he turned into him and copied them into a little book, which he took out of his pocket, he nowhere states that this book was the book on which the census of the Euchee Tribe of Indians was kept. But on a thorough examination of Schrimsher's testimony it is clear that he nowhere undertakes to state that the name of Thomas Atkins, representing Dick Atkins' and Sallie Atkins' son, was ever placed upon the Euchee tribal rolls. Furthermore, the uncontradicted testimony of witnesses whose credibility is unchallenged and the rolls of Arkansas town, on which colored people were enrolled, shows that Dick Atkins and his twelve children including Thomas, were enrolled on the Arkansas colored roll. The evidence is clear to the effect that Dick Atkins, the father of Thomas Atkins, drew the $14.40 per capita payment for his children, including Thomas, who appeared on the 1895 omitted roll of colored people of Arkansas town.

Ellis Childers, who had been a member of the House of Warriors from Cheyaha town and treasurer for the Creek Nation, testified that he paid Dick Atkins in the office of Davis & Jones Mercantile Company for his children that appeared on the omitted roll of Arkansas town. This evidence is undisputed.

A. J. Childers, known as Anderson Childers, testified that he was an enrolled citizen of the Creek tribe of Indians and was enrolled upon the tribal rolls as belonging to Cheyaha town. That he was acquainted with Arkansas colored town, which was about 15 or 18 miles from Cheyaha town. That he had held the office of town king in Cheyaha town. That he was acquainted with Dick Atkins in his lifetime. That in 1896 or 1897, pursuant to an order of the Creek Council, he prepared a roll or census of

the citizens of Cheyaha town. That while he was preparing this roll Dick Atkins applied to him to transfer from his town to Cheyaha town. That he notified Atkins that he would have to get a certificate from his own town king in order to transfer. He identified the name of Richard Atkins opposite No. 154 on the roll prepared by him and which he had printed at Wagoner, and also identified the names of Richard Atkins' children, including Thomas Atkins, and this roll of Cheyaha town appears in the record showing Richard Atkins and his children as testified to by Anderson Childers.

Just why Richard Atkins secured a transfer of himself and family from the Arkansas colored roll of Arkansas town in 1896, including his son Thomas, if his son Thomas had been enrolled as a member of the Euchee Tribe of Indians as contended by counsel for the plaintiff, is not explained by facts in the record. That Thomas Atkins, the son of Richard Atkins and Sallie Atkins, whose name appeared upon the omitted rolls of colored people of Arkansas town and which was transferred in 1896 by Richard Atkins to the rolls of Cheyaha town, is not the same Thomas Atkins enrolled on the Euchee tribal rolls opposite No. 213, is conclusively shown by the facts as disclosed by the record in this case. The record discloses that on August 26, 1899, Sallie Atkins, under the name of Sarah Atkins, applied to the Commission to the Five Civilized Tribes, known as the Dawes Commission, for the enrollment of her children, to wit: Mary E.; Margaret; John H.; Geneva; Nancy; James A.; Nathaniel; Ananias A.; Naoma; Leola; Bertie.

That on July 16, 1902, at a hearing on the application of the enrollment of these children at the office of the commission in Muskogee, permission was given to include the name of Thomas Atkins, inadvertently omitted in the original application. A part of the findings and decree of the commission in determining the application of Sallie Atkins is as follows:

"It also appears from an examination of the rolls and records of Creek Nation now in the possession of the commission, that the names of 'Mary Atkins,' 'Margaret Atkins,' 'John Atkins,' 'Geneva Atkins' and 'Nancy Atkins' identified by the commission as Mary E. Wilson, Margaret Atkins Parks, John H. Atkins, Geneva Atkins Winn and Nancy Atkins Taborn, respectively, applicants herein, are found upon the 1890 authenticated Creek tribal roll, Arkansas town; that the names 'Mary Atkins,' 'John Atkins,' 'Geneva Atkins,' 'Nancy,' 'Alex,' 'Tom,' and 'Annie,' identified by the commission as Mary E. Wilson, John H. Atkins, Geneva Atkins Winn, Nancy Atkins Taborn, James A. Atkins, Thomas Atkins and Ananias A. Atkins, respectively, applicants herein, appear upon the list of persons reported stricken from the Creek tribal rolls by the citizenship committee of the Creek Counsel, under the provision of the act of the Council approved May 15, 1895, and that the report of said committee was approved June 7, 1895, and that the names of 'Alexander Atkins,' 'Nathanial Atkins,' 'Thomas Atkins,' 'Viola Atkins,' 'Bertha Atkins,' 'Henry Atkins,' Ananias Atkins,' 'Lomie Atkins,' identified by the commission as James A. Atkins, Nathaniel Atkins, Thomas Atkins, Leola Atkins, Bertie Atkins, John A. Atkins, Ananias Atkins. and Naomi Atkins, respectively, applicants herein appear upon the 1895 omitted roll, Arkansas town, approved by the Creek National Council December 4, 1895.

"It further appears from the record herein, that said Thomas Atkins died prior to April 1, 1899.

"It is therefore the opinion of this commission that the said Mary E. Wilson, Geneva Atkins Winn, Thomas Atkins, Nancy Atkins Taborn and her two children, Susie Atkins Taborn, and Albert Taborn, are not citizens of the Creek Nation enrollment, and that the application for their enrollment should be denied; that the said Margaret Atkins Parks, John H. Atkins, James A. Atkins, Nathaniel Atkins, Annanias A. Atkins, Naoma Atkins, Leola Atkins and Bertie Atkins are recognized citizens of the Creek Nation, and that the application for their enrollment should be granted, and it is so ordered.

"Dated at Muskogee, Indian Territory, this 13th day of November, 1902."

The order of the commission denying Thomas Atkins, the son of Richard and Sallie Atkins, right to citizenship was affirmed by the Secretary of the Interior January 24, 1903. A motion was filed for review of the order denying Thomas Atkins the right to citizenship, and under the order of the Secretary of the Interior the decision was reviewed and the former decision adhered to on September 5, 1905, which decision was affirmed by the Secretary of the Interior. The order and decision of the Commission to the Five Civilized Tribes denying Thomas Atkins the right to citizenship as a Creek citizen and the right to participate in the allotment and distribution of the lands belonging to the Creek Tribe of Indians is found in the record, and it is clear that no reason has been advanced why this order and judg-

ment by the commission is not conclusive of his right to Creek citizenship.

By the act of Congress of June 10, 1896, 29 Stat. 339, it was the duty of the Commission to the Five Civilized Tribes to hear and determine applications for citizenship in any of the tribes. By that act it was made the duty of the commission in determining applications for citizenship to give due force and effect to the rolls, usage, and customs of each of said nations or tribes.

By the act of June 7, 1897, 30 Stat. 84, c. 3, the term "rolls of citizenship," as used in the act of June 10, 1896, was construed to mean "the last authenticated rolls of each tribe which have been approved by the Council of the Nations and the descendants of those appearing on such rolls."

By the act of June 28, 1898, 30 Stat. 502, c. 517, p. 21, the commission was authorized and directed to take the roll of the Cherokee citizens of 1895 and "to enroll all those living found on the roll and certain other persons specified, and to make correct rolls of the citizens by blood of all other tribes, eliminating from the tribal rolls such names as may have been placed thereon by fraud, or without authority of law, enrolling such only as may have lawful right thereto and their descendants since such rolls were made."

Under section 21 of this act it was provided:

"Said commission shall make such rolls descriptive of the persons thereon, so that they may be thereby identified, and it is authorized to take a census of each of said tribes, or to adopt any other means by them deemed necessary to enable them to make such rolls. They shall have access to all rolls and records of the several tribes, and the United States court in Indian Territory shall have jurisdiction to compel the officers of the tribal governments and custodians of such rolls and records to deliver same to said commission. * * *"

"The rolls so made, when approved by the Secretary of the Interior, shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them, with such persons as may intermarry according to tribal laws, shall alone constitute the several tribes which they represent."

It is clear that the Congress in mandatory language commanded the commission in making the rolls of citizens to make such rolls descriptive of such citizens, so such citizens could be identified from the rolls so made. It cannot be doubted that it was indispensable to the proper distribution of the property belonging to the different tribes, where a number of citizens of the same name would appear upon the rolls, that such rolls must be so descriptive of a citizen as to differentiate one citizen from another.

It is clear from a consideration of the various acts of Congress why the Commission to the Five Civilized Tribes adopted the system of making a census card for each citizen admitted to citizenship. This card is in effect a description of a citizen which the commission has adjudicated was entitled to be enrolled upon the final approved rolls of the commission as a citizen of one of the Five Civilized Tribes. The information furnished on this card, such as the sex, age, and parentage of the citizen, is descriptive matter, and there may appear an error as to one or more of these descriptive words which would not destroy the identity of the citizen. But considering the fact that these descriptive words were placed upon this record pursuant to a statutory duty as a matter of evidence, they are entitled to great weight, and cannot and will not be discredited or ignored in the absence of strong and convincing evidence to the contrary. In determining the identity of a citizen from the enrollment record it is the duty of the court to consider the entire record, and a record made pursuant to a duty prescribed by law, in the absence of fraud or error, is conclusive of everything required to be recorded in the record, and is not subject to collateral attack, but may only be corrected as to error in a direct proceeding instituted for that purpose. In the case of Hegler v. Faulkner, 153 U. S. 109, 38 L. Ed. 653, the Supreme Court of the United States clearly announces the rule as to the conclusiveness of a judicial decree in the following language:

"Conclusiveness is a characteristic of the judgment of every tribunal acting judicially, whilst acting within the sphere of its jurisdiction, where no appellate tribunal is created. But such conclusiveness is restricted to those questions which are directly submitted for decision."

The rule in 1 Greenl. Ev., par. 483, as follows, is approved:

"It must be remembered that official registers are not in general evidence of any fact not required to be recorded in them, and which did not occur in the presence of the registering officer."

In the case of Malone v. Alderdice, 212 Fed. 668, the Circuit Court of Appeals for the Eighth Circuit, the court was considering the question as to whether it was indispensable to determine the age of an applicant for enrollment by the commission. Judge Sanborn, in writing the opinion for the court, said:

"The position is not without persuasive power when a view of this legislation is taken, but when these statutes are analyzed and the real issue, the question whether or not it was essential to the determination of the issue who should be enrolled that the commission should adjudge when the minority of each minor would cease, is kept constantly in mind the force of the argument disappears. The provision of the act of June 28, 1898, that the commission should make the rolls descriptive of the persons thereon so that they might be identified falls far short of granting jurisdiction to that commission to adjudge conclusively on what day each minor on those rolls would attain his majority and thus to determine when he could buy, sell, and convey property free from the disqualifications of his minority. As well might it be claimed that the commission's description on its roll of a male as a female would conclusively adjudge that he was without right to marry a woman, or that the recital of the ages of minor heirs as a matter of description in the record in a probate court of the administration and distribution to them of the estate of their ancestor would conclusively adjudge the time when their respective minorities would cease. This was not the purpose or the effect of this provision of the act of 1898. It was limited in object and in result to the making of a description of the persons enrolled for the purpose of their identification, and not for the purpose of the final adjudication of the extent and limits of their disqualifications by reason of their respective ages or otherwise."

The learned judge in this opinion makes it clear that the commission was limited in its object and result to the making of a description of the persons enrolled for the purpose of their identification, but it was not intended that the commission should adjudge as to the qualifications of such citizen to dispose of his property at a certain age. So it is clear in the case at bar that it was not within the purpose and object of the commission to determine the parentage of Thomas Atkins with a view of adjudicating who his heirs would be in case of death. However, it is apparent that in determining the identity of the citizen enrolled the enrollment record as a whole is the conclusive means by which this identification is made.

In the case of Perryman v. Sharp, 71 Oklahoma, 176 Pac. 526, this court held that the finding or conclusion of the Commission to the Five Civilized Tribes prior to the act of May 27, 1908, 35 Stat. 312, was not conclusive as to the age of an enrolled citizen so as to determine his right to alienate his allotted lands.

Mr. Justice Miley, in delivering the opinion of the court, after clearly pointing out that the conclusions of the commission, which are a part of the enrollment record, are at all times entitled to great weight as to a specific finding of the commission, such as the finding of the enrolled citizen as to sex or age, stated that such finding will not be permitted to defeat the purpose of the Congress in enacting legislation with respect to the Indians, and that a palpable error appearing as to a particular part of the enrollment record will not be permitted to defeat a fact clearly appearing from a consideration of the entire record. The following statement found in the opinion clearly supports the contention that a fact deducible from the entire record, such as identity, is controlling:

"While the conclusion of the commission is a part of the enrollment record, and should at all times be given very great weight as such, yet where, as in this case, that conclusion is palpably erroneous, the purpose of Congress in enacting this legislation and the ends of justice must not be defeated by allowing that conclusion to overcome the fact otherwise appearing from the entire record."

In the case of Folk et al. v. United States et al., 233 Fed. 191, Judge Sanborn, regarded and respected as an able and conscientious judge, after pointing out that the testimony in the case disclosed that the Creek tribal roll of 1890 recorded Minnie Atkins and two children, Thomas and Mary, and the Creek tribal roll 1895 recorded Minnie Atkins and Thomas Atkins, and a receipt of Minnie Atkins upon the payroll of 1895 for the per capita payment for her son Thomas, the court further says:

"It is not much more probable that those rolls are right, that Thomas Atkins was living when they were made, and that the people of Euchee township, at whose meetings they were corrected, knew that he was living, and satisfied the officers of the tribe of that fact, than it is that the testimony of witnesses gathered by interested parties to testify to occurrences 20 years behind them tending to show that no such person existed is true? This court will

hesitate long to hold on such testimony that Thomas Atkins never existed in the face of these old and hitherto unassailed corrected rolls of the Creek Tribe, and their persuasive evidence of a living Thomas Atkins, the son of Minnie Atkins, when they were made. The proof now before the court that he never existed, that he was a myth, is not clear, unambiguous, convincing, or satisfactory to this court."

There is no escape from the rule announced in this case that such record evidence is entitled to great weight, and before such solemn records and their force and effect may be destroyed the evidence to the contrary must be clear and convincing.

Record evidence of a record made pursuant to law is always entitled to great weight. In Canada under the law it was the duty of the parents when they presented their child to the priest for baptism, to declare the date of birth, the names and occupation of the father and mother, and it was the duty of the priest to make the entry of record. The parish register of these entries was held to be the best source of evidence as to the parents of a child.

In the case of Denoyer v. Ryan, 24 Fed. 77, in a case involving the identity of the plaintiff, asserting himself to be the sole and only heir at law of the deceased, Judge Nelson, in deciding the case, said:

"The complainant's case would be established pretty clearly if there were no record evidence countervailing the theory advanced by him. The hearsay testimony of aged and deceased members of the family is very proper and admissible in suits of this kind, and it is allowed from the necessity of the case; for in many instances it is the only evidence possible to establish pedigree and consanguinity."

The court then, after reviewing the oral testimony of the plaintiff, said:

"It was the duty of Antoine Denoyer, when the child was presented for baptism, to declare the day of birth, and the names and occupation, etc., of the father and mother, and it was the duty of the priest to make the entry. The parents, if present, and sponsors were required to sign the record, and if any of them could not sign their names, mention of that fact was required by law to be made in the entry. This record, therefore, raises a presumption that the Isaie, who lived with, and was brought up in, the family of Antoine, was his legitimate offspring, and overcomes all the oral evidence of witnesses of the declarations and admissions of Stephen Denoyer and others. * * * The fact required to be established is the identity of the claimant, who lived in Antoine's family, with the child presented for baptism, and this certificate of entry is evidence of that fact."

In the case of United States v. Lena, 261 Fed. 144, the court was considering a case tried in the district court of the Eastern district of Oklahoma instituted on June 5, 1915, by the United States on behalf of the Creek Nation of Indians to set aside two patents issued to Emma Coker. It was the theory of the government that Hettie Lena and Emma Coker were identical and that the issuance of the patents to the latter constituted a duplicate issue. Mr. Angell, who was an employe of the Commission to the Five Civilized Tribes, engaged in Creek enrollment work, testified in the trial of the case as follows:

"In some instances we would take the names off the tribal rolls that we were to investigate. In this particular instance, I do not remember whether we had a card, but we did have something to remind us that we were to investigate the name 'Emma,' which appeared opposite No. 279 on the Little River Tulsa Creek roll, and our inquiry was concerning that name. I do not know who wrote the word 'Coker' in lead pencil on Government's Exhibit No. 5."

Mr. Merrick, an employe of the commission, testified that the name "Emma" appeared on the 1895 Little River Tulsa No. 279, unaccounted for up to May 23, 1901, and she was one among those that were listed on cards to have their names on a card prior to the ratification of the agreement in order to preserve any rights she might have.

Judge Youmans, in delivering the opinion of the court, said:

"The testimony does not sustain the allegation in the amended bill that the commission rejected the name and person represented by the name Emma on the 1895 Creek tribal roll. The word 'Rewritten,' as it appears on the card prepared by or under the direction of Mr. Merrick, does not warrant the conclusion that the investigation with regard to Emma had terminated, and that she was rejected as one having no claim as a Creek citizen. It is clear that in the course of the investigation she was erroneously identified by Mr. Angell, or his party, as the wife of Charles Coker. It developed that Hettie Lena was the wife of Charles Coker, and to that extent there was confusion regarding the two persons, Hettie Lena and Emma; but that confusion did not destroy the identity of Emma as established by the tribal roll of 1895. She was the Emma under investigation by the Dawes Commission, and the patents that were issued were intended for

her. The erroneous conclusion of a change of status did not destroy her identity.

"The attorney for the United States offered to prove that a child called Emma was at one time in the family of Loskey, and that she was the daughter of Sophia, or granddaughter of Loskey, and that she was born about 1894 and died before she was 2 years old, and that no person named Emma in the family of Loskey was living on April 1, 1899.

"Objection was made to that portion of the offer that no person named Emma in the family of Loskey was living April 1, 1899. This objection was sustained by the court and the action of the court is assigned as error. In the case of United States v. Wildcat, 244 U. S. 111, 118, 124, 37 Sup. Ct. 561, 564, 566 (61 L. Ed. 1024), with reference to the action of the commission, the Supreme Court said:

" 'A correct conclusion was not necessary to the finality and binding character of its decisions. It may be that the commission in acting upon the many cases before it made mistakes which are now impossible of correction. This might easily be so, for the commission passed upon the rights of thousands claiming membership in the tribe, and ascertained the rights of others who did not appear before it, upon the merits of whose standing the commission had to pass with the best information which it could obtain. * * * It is true that the methods followed by the commission may not have been the most satisfactory possible of determining who were entitled to enrollment as living persons on April 1, 1899; but it must be remembered that there were many persons whose right to enrollment was being considered, and the commission in good faith made an honest endeavor to keep the names of persons off the rolls who were not entitled to appear as members of the tribe upon the date fixed by Congress.'

"In the case of Folk v. United States, 233 Fed. 177, 189, 147 C. C. A. 183, 195, Judge Sanborn, speaking for this court, said:

" 'As the commission was required by the acts of Congress to give full force and effect to the authenticated tribal rolls, the usages and customs of each tribe, and was by those acts given access to all their rolls and records, the Creek rolls of 1890 and 1895, on each of which Minnie Atkins and Thomas Atkins as her son were enrolled as citizens of the tribe by blood, constituted not only prima facie, but, in the absence of strong and persuasive countervailing proof, conclusive evidence before the commission of the right of Thomas Atkins to enrollment as a citizen of the Creek Tribe. In the face of this record counsel for the plaintiffs no longer contend in this court, as they pleaded in the court below, that "no evidence of any character was produced before, or had or obtained by said commission with respect to the right of the alleged Thomas Atkins under said act of Congress to be so enrolled"; but they now argue that, although all the evidence and information disclosed above was before the commission, there was no evidence before them that Thomas Atkins was living on April 1, 1899. The answer is, first, that the testimony of Merrick and Lyons tends to show that Merrick, who made the census card, had information that he was living before making that card, and made it in reliance upon such information; and second, that the authenticated Creek roll of 1895 was conclusive evidence that he was living in that year, and, in the absence of any direct evidence before the commission that he had died, or that he had been in such a dangerous situation that men of reasonable prudence would infer that he had died, prior to April 1, 1899, the conclusive legal presumption was that he continued to live for at least seven years after the making of the Creek roll in 1895, and hence that he was living on April 1, 1899. In the absence of proof of earlier death, or of evidence of unusual danger of such earlier death, the legal presumption is that a live person continues to live for at least 7 years.'

"The mistake made by the commission in tracing the identity of Emma in the family of Loskey did not relate to the essential point to be determined, which was whether she was alive on April 1, 1899. The appearance of her name on the 1895 roll was conclusive evidence that she was living in that year, and in the absence of any direct evidence before the commission that she had died prior to April 1, 1899, the conclusive legal presumption to be drawn by the commission was that she was alive on that date."

The tribal roll number in this case of Little River Tulsa 279 on the 1895 roll appearing on the census card made by the Dawes Commission was held to be conclusive evidence as to the person investigated and enrolled by the commission. The rule was announced by Judge Sanborn in Folk v. United States, supra, that the tribal rolls of 1890 and 1895 not only constituted prima facie, but in the absence of strong and persuasive countervailing proof conclusive, evidence as to the right of the citizen appearing thereon to enrollment. This authority sustains the contention that the citizen to whom the patents were issued to the lands in controversy, in the case at bar, was by the tribal rolls and the census card made by the Dawes Commission conclusively shown to be the Thomas Atkins appearing on the Euchee tribal rolls of 1895.

The Circuit Court of Appeals of the Eighth Circuit, in the case of Porter v.

United States et al., 260 Fed. 1, affirmed the judgment entered by Judge Campbell in the United States court for the Eastern district. The action was instituted by the government to cancel three patents for as many allotments, which it was alleged were made by mistake to the same Creek citizen under different names, when that citizen was entitled to but one allotment. It was alleged that Nellie Porter, Nellie Deer, and Lettie McGilbra were one and the same person. The heirs for Lettie McGilbra filed a cross-petition in which they denied Lettie McGilbra were one and the same person as Nellie Porter, alias Nellie Deer. It was conceded by the parties to the action that Nellie Porter and Nellie Deer were one and the same person. The issue involved was whether Lettie McGilbra was the same person as Nellie Porter. The decree was in favor of Lettie McGilbra. Judge Campbell in his findings of fact and conclusions of law stated that Lettie McGilbra, the daughter of Lizzie McGilbra, appeared upon the 1895 tribal roll opposite No. 80 of Tulmochusee town. That this was the name transferred by the commission from the tribal roll to the census card, and that when the name was originally and tentatively enrolled on the census card it stood for the child of Lizzie McGilbra and not for Nellie Porter. That later, when the census card was completed, it bore the additional data that Lettie McGilbra was six years of age, female full-blood, whose father was Jonas Deer and whose mother was Jennie McGilbra. The government contended, because this description fits the Nellie Porter, alias Nellie Deer, even though she be not the Lettie McGilbra originally appearing upon the tribal roll, although not conceded, still it is clear that she is the person whom the Dawes Commission identified as the Lettie McGilbra originally enrolled and that she was in fact the person whom the Dawes Commission had in mind when the name Lettie McGilbra was placed on the final approved rolls. Judge Campbell in the following language repudiated the contention made by the government:

"Having concluded that the name Lettie McGilbra, as it appeared upon the original 1895 tribal roll, represented, not Nellie Porter, nor Nellie Deer, nor Nellie McGilbra, but Lettie McGilbra, an entirely different person, the appearance of that name on the 1895 tribal roll under the circumstances of this case must be treated in contemplation of law as the application of Lettie McGilbra for enrollment by the Dawes Commission. They entertained that application when they transferred the name to the census card. They then, pursuant to such application, proceeded to investigate her right to enrollment. However misleading, or however far from the truth, may have been the information secured in the course of such investigation, still the person whose right to enrollment was being investigated was the individual represented by the name on the tribal roll. She was the applicant. This applicant was Lettie McGilbra. The commission acted favorably on said application and enrolled the applicant. It follows that this name on the approved roll represents, not Nellie Porter, nor Nellie Deer, but Lettie McGilbra, deceased, daughter of Lizzie McGilbra. Involved in this enrollment is the conclusive finding by the Dawes Commission that Lettie McGilbra was a duly and legally enrolled member of the Creek Tribe in 1895, and who was living April 1, 1899."

It is important to notice that Judge Campbell held that the finding of the Dawes Commission in this situation was conclusive as to the right of the citizen appearing upon the tribal roll opposite No. 80 to enrollment. That the application of whatever citizen by whatever name appearing opposite No. 80 on the 1895 tribal roll was the applicant investigated and considered by the commission.

Counsel for the plaintiff in this cause rely upon the case of United States v. Porter, supra, and concede the soundness of the rule announced by Judge Campbell and affirmed by the Circuit Court of Appeals, but contend that the testimony of Ed Schrimsher shows that the name of Thomas Atkins appearing upon the Euchee tribal rolls of 1895 represents the son of Richard Atkins and Sallie Atkins. It appears clear to us that Schrimsher gave no testimony from which such an inference may be drawn. Conceding that he did give such testimony, Thomas Atkins appearing upon the Euchee roll as the child of Minnie Atkins and identified on the census card as the child of Minnie Atkins, and it being conclusively shown that Thomas Atkins, the child of the plaintiff, Sallie Atkins, had been investigated by the Commission to the Five Civilized Tribes on two different hearings and by solemn judgment of the Dawes Commission denied the right of citizenship for the reason that he died prior to April 1, 1899, and this record standing unchallenged and unimpeached, such testimony, in this situation, in a law action is without legal effect.

The rule is well established and universally adhered to by the courts that a judicial record imparts absolute verity and is conclusive concerning the matters to which

it relates, 22 C. J. 968; Boynton v. Crockett, 12 Okla. 57, 69 Pac. 869; Hegler v. Faulkner, 153 U. S. 109, 38 L. Ed. 653; Sawyer v. Manchester & Keene R. R. Co., 62 N. H. 135, 13 Am. St. Rep. 541

The general rule appears to be, and supported by authorities, that parol evidence is inadmissible to contradict the facts contained in a judicial record or any public record kept pursuant to a duty prescribed by law, and that such a record cannot be impeached collaterally. Hutchinson v. Pratt, 11 Vt. 402; People v. Zeyst, 23 N. Y. 140; Gaither v. Tax Collector, 40 La. Ann. 362.

The evidence in the case at bar discloses that there has been a solemn record since about the year 1890 in which Thomas Atkins is recorded as the child of Minnie Atkins, commencing with the Euchee tribal rolls of 1890. That in the year 1902 a solemn judgment of the Commission to the Five Civilized Tribes, a quasi judicial body, was entered denying Thomas Atkins, the son of Richard and Sallie Atkins, the right to Creek citizenship. See Tom et al. v. Mills, 87 Okla.——, 209 Pac. 163. This judgment was twice affirmed by the Secretary of the Interior. Here is one record of more than 30 years' duration; another record of 20 years' duration. The last one the decree of a quasi judicial tribunal that was vested with jurisdiction to determine the question adjudicated. To permit the plaintiff to collaterally attack and destroy the force and effect of the order of the commission denying the son of the plaintiff to citizenship would be to establish a precedent without a parallel in the history of civil jurisprudence. It would mean that the thousands of land titles that have their origin based upon the judgment of the Dawes Commission determining citizenship in this state have no stability. That the judgments of this commission would be subject to being impeached and modified by the testimony of perjured, corrupt, and prejudiced witnesses long years after the same have been made. That the land titles resting upon the verity of these decrees would be insecure until the parties holding such titles had instituted an action and proved the judgments of the Dawes Commission to be reliable. The Supreme Court of New Hampshire, in the case of Sawyer v. Manchester & Keene R. R. Co., supra, held:

"A record not conclusive until it is proved to be right, not reliable unless it is shown to be correct, would be no better than no record, and its tendency to mislead might make it worse than none. In the language of Ladd, J., in Bell v. Pike, 53 N. H. 478: 'For all the practical uses of a record, it is no record at all. It lacks the fundamental attributes of verity, without which the first and most important definition of a record is not answered. It cannot form the basis of action anywhere, or for any purpose. It leaves the truth to be ascertained by an investigation of the antecedent facts upon which it purports to be based, as much as if nothing had been written.'"

If any doubt existed as to the mischievous result that would follow in permitting the impeachment of solemn records made pursuant to law, such doubt is readily removed by the facts as disclosed in the motion of the defendants in this cause for a new trial.. The letters written by the witness, Schrimsher, to James A. Harris and introduced in support of the motion for a new trial, considered in connection with the affidavits of Judge Malcolm E. Rosser, William Harris, and James A. Harris, are conclusive of the fact that the testimony of Schrimsher, which if given the effect contended for by counsel for plaintiff, was contradictory of the tribal enrollment records of the Creek Tribe of Indians and the solemn judgment of the Commission to the Five Civilized Tribes, is wholly unreliable and bears every mark of being untrue. However, it is unnecessary for this court to determine the truthfulness of his statements. We are clear his evidence has no probative force. To permit such testimony to have the legal effect of destroying the fundamental attributes of solemn records, that of verity, would mean in effect that vested property rights resting upon the solid foundation of record evidence and judicial decrees may be swept away by vague, indefinite, and uncertain oral statements of unreliable witnesses testifying to transactions happening many years ago. The authorities uniformly condemn such a course of procedure.

The supplemental motion for a new trial filed by the defendants, asking for a new trial upon the ground of newly discovered testimony, attaching the letters and affidavits above referred to, the judgment rendered by the trial court, the briefs filed on behalf of the plaintiff, and the statements of the trial judge included in the record, conclusively show that upon no other theory is there any serious attempt to justify the judgment of the trial court except upon the testimony given by Ed Schrimsher. With these letters and affidavits of reputable citizens in the record disclosing the

falsity of Schrimsher's testimony and his willingness to testify on behalf of anyone who was willing to pay him, counsel for the plaintiff contented themselves by making no response to this motion nor availing themselves of the opportunity of cross-examining the witnesses who had made the affidavits on the hearing of the motion for a new trial. While the rule is supported by the authorities that where it is shown on a motion for a new trial that false and perjured testimony was given on which the judgment rests and the other party had no fair opportunity to rebut, it is the duty of the court to grant a new trial. State v. Mounkes (Kan.) 138 Pac. 410; Henry v. Mo., K. & T. Ry. Co. (Kan.) 158 Pac. 857.

The defendants introduced in this case a large number of witnesses to establish the fact that Minnie Atkins had a child by the name of Thomas Atkins, and introduced in evidence a decree and judgment of the federal district court for the Eastern district of Oklahoma decreeing that Thomas Atkins was the son of Minnie Atkins in an action in equity by the United States of America et al., against Minnie Folk, nee Atkins, which decree in favor of Minnie Atkins was affirmed by the Circuit Court of Appeals for the Eighth Circuit in 268 Fed. 923, and the decree of the Circuit Court of Appeals for the Eighth Circuit entered in the case of Folk et al. v. The United States et al., in which Minnie Atkins was decreed to be the mother of Thomas Atkins, the allottee of the lands in controversy. We deem it unnecessary to consider that issue. This being an ejectment action, the rule is that the plaintiff must recover by the strength of his own title, and not through the weakness of his adversary's. This rule has become the settled law in this state. Linam v. Beck, 51 Okla. 727, 152 Pac. 344; Lynch v. Calkins, 75 Okla. 137, 182 Pac. 225; Starr v. Thompson, 80 Okla. 223, 195 Pac. 758; Reirdon et al. v. Smith et al., 62 Okla. 48, 161 Pac. 798; Ramsey v. Kennedy et al., 86 Okla. 30, 206 Pac. 209.

The rule is, in a suit to quiet title, plaintiff must recover upon the strength of his own title, and not upon the weakness of that of his adversary, except where the parties claim title through a common source. It is then sufficient that a plaintiff connect his title with that of the common grantor. New Mexico Realty Company v. Security Investment & Development Company (N. M.) 204 Pac. 984; Eichoff v. Scott, 137 Ark. 170, 208 S. W. 421.

We are clearly of the opinion in the case at bar that the order of the Commission to the Five Civilized Tribes denying the son of the plaintiff the right to citizenship as a member of the Creek Tribe of Indians is conclusive against the right of the plaintiff to recover in this case, and that there is no evidence in the record justifying the judgment rendered by the trial court.

Counsel for the plaintiff argued that this court is precluded from considering the sufficiency of the evidence to sustain the judgment of trial court for the reason that the defendants did not interpose a demurrer to the evidence of the plaintiff or move the court for judgment. This contention made by counsel for plaintiff has been repudiated by this court in the case of Porter v. Wilson, 39 Okla. 500, 135 Pac. 732, and in the case of Lyon v. Lyon, 39 Okla. 111, 134 Pac. 650. In the case of Lyon v. Lyon, supra, this court specifically held in the first paragraph of the syllabus of the opinion that a demurrer to the evidence is not expressly authorized under section 5002, Revised Laws 1910, in cases tried to the court without a jury, and that the court may in such cases where a demurrer is interposed decline to pass upon it. But, in view of our conclusion in this case, if there is no evidence supporting the judgment of the court, this question is not material in this case. Furthermore, the legal effect to be given to the enrollment records and the decree of the Commission to the Five Civilized Tribes presented purely questions of law for the court. We are not unmindful of the rule well established in this jurisdiction that a verdict or judgment rendered upon conflicting testimony in a law action will not be disturbed where there is evidence reasonably tending to support such verdict or judgment, but this court is also committed to the rule that in a case where there is no evidence reasonably tending to support a verdict and judgment, it will be reversed. Tate et al. v. Coalgate State Bank, 72 Oklahoma, 180 Pac. 687. Chief Justice Harrison, speaking for the court in this case, said:

"The clause, 'where there is evidence reasonably tending to support a verdict,' means evidence that is competent, relevant, and material and which to a rational and impartial mind naturally leads or involuntarily tends to lead to a conclusion—to a verdict—for which there is a valid, just, and substantial reason, and not one that is based upon an unfounded suspicion or is the result of a mere chimerical conjecture."

Many authorities are cited in the opinion supporting this rule.

The rule will be found in 23 C. J. p. 51, par. 1795:

"A verdict or finding must rest upon facts proved, or at least upon facts of which there is substantial evidence, and cannot rest upon mere surmise, speculation, conjecture, or suspicion. There must be legal evidence of every material fact necessary to support the verdict or finding, and such verdict or finding must be grounded on a reasonable certainty as to probabilities arising from a fair consideration of the evidence, and not a mere guess, or on possibilities."

In view of the fact that we are clearly convinced that under the facts, as disclosed by the record, the plaintiff is precluded from recovering the lands in controversy, it is the duty of this court to enter judgment.

This court in the case of Kernodle v. Elder, 23 Okla. 743, 102 Pac. 138, held:

"Where in such a case it is apparent from the record that the claim of plaintiff cannot be sustained, on reversal the court will not remand for new trial, but will direct a dismissal."

In Ruemmeli-Braun Co. v. James W. Cahill, 14 Okla. 422, 79 Pac. 260, the court held:

"If, from an examination of the whole record, it clearly appears that the evidence does not reasonably support the verdict, and that a new trial will not change the result, this court will reverse the judgment of the court below, and remand the case with direction to enter judgment for the adverse party."

In Vary v. Sensabaugh et al., 47 South. 196, it is held by the Supreme Court of Alabama:

"Where the evidence in an ejectment case tried by the court without a jury shows title in plaintiff, and the conclusions of the trial court are properly presented to the Supreme Court for review, on reversing a judgment for defendant, judgment for plaintiff will be rendered."

Other authorities to the same effect are: Moore v. Calvert, 8 Okla. 385, 58 Pac. 627; St L. & S. F. R. Co. v. McGivney, 19 Okla. 362, 91 Pac. 693; City of Danville v. Danville Ry. & Elec. Co. (Va.) 43 L. R. A. (N. S.) 463; Worth v. Butler (Kan.) 112 Pac. 111; Iroquois Furnace Co. v. Elphicke et al. (Ill.) 65 N. E. 784; Moore v. Burger (N. D.) 107 N. W. 200; Will A. Watkin Music Co. v. Basham (Tex. Civ. App.) 106 S. W. 734; Douglas v. Anderson (Kan.) 4 Pac. 257; Revised Laws of 1910, sec. 5258; 4 C. J. 1187 to 1192, inclusive.

It is therefore ordered that the judgment of the trial court be, and is, reversed, and the cause is remanded to the district court of Creek county, with directions to enter judgment in favor of the defendants.

HARRISON, C. J., and JOHNSON, MILLER, and ELTING, JJ., concur.

NICHOLSON, J., concurs in the conclusion reached.

PITCHFORD, V. C. J., concurs in reversing the judgment of the trial court, but dissents to directing the trial court to enter judgment.

McNEILL, J., concurs in reversing the judgment of the trial court on the ground that the motion for a new trial based upon newly discovered evidence should have been sustained.