### MOWDY et al. v. LEEPER et al.

No. 15635—Opinion Filed May 18, 1926.

Rehearing Denied Nov. 9, 1926.

#### (Syllabus.)

**1. Indians—Enrollment Records — Conclusiveness of Descriptive Portion of Rolls.**

The rolls of citizens for the Five Civilized Tribes of Indians were required by section 21 of the Act of Congress of June 28, 1898, known as the Curtis Act, to be made descriptive of the parties whose names appeared thereon, to the end that each person might thereby be identified. The descriptive part of such rolls, however, does not have the force and effect of a judicial determination of the matters shown thereon.

**2. Same—Prima Facie Evidence of Parentage.**

The enrollment record made by the Commission to the Five Civilized Tribes, under the said section 21 of the said Act of Congress of June 28, 1898. and that part thereof which is descriptive of the persons so enrolled, is prima facie evidence as to the matters shown thereon, such as parentage, etc., and if the persons so shown thereon as being the parents of the allottee are contended not to have been such parents, the burden is on the party asserting the incorrectness of such enrollment record, and the same cannot be overthrown, except by clear, cogent, and convincing proof.

**3. Same.**

Record in the instant case examined, and held that the enrollment record showing the name of the father of Mary Moore as being Charlie Carney is not overcome by the evidence disclosed at the trial.

Error from District Court, Love County; Asa E. Walden, Judge.

Action by John Mowdy and another against J. D. Leeper and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

A. C. Sewell, for plaintiffs in error.

E. P. Hill, Wm. P. Hill; Geo. L. Hill, and Kent V. Gay, for defendants in error.

BRANSON, V. C. J. Plaintiffs in this action assert a one-third interest in a certain Choctaw allotment in Love county. Dora Anderson, nee Moore, and Sampson Moore, Choctaws, are the grantors of the plaintiffs herein. The land was allotted to one Charlie Keel, a citizen by blood of the Choctaw Nation. The allottee died in 1917. The allottee will hereinafter be referred to as Charlie Keel, Jr. His father was one Charlie Keel, a citizen of the Choctaw Nation, and he will be referred to herein as Charlie Keel, Sr. The said Charlie Keel, Sr., plaintiffs contend, was married twice, Of the first marriage, one child was born, whose name was Mary; and this Mary, daughter of the first marriage of the said Charlie Keel, Sr., was a half sister of the allottee. If this were established as a fact, the plaintiffs were entitled to judgment for the interest sued for. The defendants contend that Mary (alleged to have been the daughter of the first marriage of Charlie Keel, Sr.), the mother of Dora Anderson, nee Moore, and Sampson Moore, and certain other children (deceased), was not the daughter of Charlie Keel, Sr., and was no blood relation to the allottee.

The trial court found the issue in favor of the defendants; that is to say. the finding of the trial court was that Mary, who is conceded to have been the mother of Dora Anderson and Sampson Moore, was as a matter of fact not by the evidence shown to have been the daughter of Charlie Keel. Sr. The only question on this appeal is whether or not there was sufficient evidence to warrant reversing the trial court as to this finding. Plaintiffs introduced several witnesses. The probative value of the testimony of these witnesses was by the trial court weighed against the enrollment record; and the question is, was same sufficient to overcome the presumption of correctness attached to the enrollment record of Mary Moore and her children, made by the Commission to the Five Civilized Tribes?

Before giving a synopsis of the evidence offered by the plaintiffs, it might be well to call attention to certain of the provisions of section 21 of the Act of Congress of June 28, 1889, 30 Stat, at L. 495, commonly known as the Curtis Act. At the time of the passage of this act, there existed what was generally known as the Dawes Commission. It was properly called the Commission to the Five Civilized Tribes. From 1893 until its abolition in 1907, it was continuously given increased power to make a roll to be known as the final approved roll of those entitled to citizenship in each of the Five Civilized Indian Tribes. It was necessary that such roll be made accurately, for that upon the same an allotment was to be set aside to each citizen who appeared thereon. The amount of land allotted to each citizen varied in the

different tribes. In the Choctaw Nation it was 320 acres off average allottable land. In the said section 21, in reference to the said Dawes Commission, it is provided:

"Said Commission shall have authority to determine the identity of Choctaw Indians claiming rights in the Choctaw lands under article 14 of the treaty between the United States and the Choctaw Nation, concluded September 27. 1830, and to that end may administer oaths, examine witnesses and perform all other acts necessary thereto, and make report to the Secretary of the Interior.

"The said Commission shall make such rolls descriptive of the persons thereon, so that they may be thereby identified, and it is authorized to take a census of each of said tribes, or to adopt any other means by them (it) deemed necessary to enable them to make such rolls. They shall have access to all rolls and records of the several tribes, and the United States Court in the Indian Territory shall have the jurisdiction to compel the officers of the tribal governments and custodians of such rolls and records to deliver same to said Commission, and also to require all citizens of said tribes and persons who should be so enrolled to appear before said Commission for enrollment at such times and places as may be fixed by said Commission, and to enforce obedience of all others concerned. so far as the same may be necessary to enable said Commission to make rolls as herein required, and to punish anyone who may in any manner or by any means obstruct said work.

"The rolls so made when approved by the Secretary of the Interior shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them * * * shall alone constitute the several tribes which they represent.

"The members of said Commission shall, in performing all duties required of them by law, have authority to administer oaths, examine witnesses, and send for persons and papers, and any person who shall willfully and knowingly make any false affidavit or oath to any material fact or matter before any member of said Commission or before any other officer authorized to administer oaths * * * shall be deemd guilty of perjury. * * * "

It will thus be seen that the zone of operation of the said Commission was wide. It was intentionally made so, in order that the persons who were by it adjudged to be entitled to go on said rolls might be not only accurately determined, but their identity accurately determined, for it is said that "said Commission shall make such rolls descriptive of the persons thereon, so that they may be thereby identified." The question of the identity of persons claiming to be citizens of

the Choctaw Nation was one most material, for on it depended the right of the person to enrollment, and a consequent allotment of land. and the injunction imposed upon the said Commission by Congress in the used language used, as to making the rolls descriptive of the persons for the purpose of identification, would readily be seen was of prime importance.

In the instant case, for example, the person whose identity is in dispute was enrolled as Mary Moore. Among the many thousands of citizens of the Choctaw Nation, there were, no doubt, hundreds of Indians named Moore. There were, no doubt. many who were enrolled as Mary Moore. So in determining which was the particular Mary Moore to whom any particular tract of land was allotted, her age was taken, the names of her father and mother were required to be given, if known. In doing this work, it must be noted, as above set out, that the said act gave the said Commission authority to require all citizens of said tribes who should be so enrolled to appear before the Commission. Access was given to all of the numerous tribal rolls made by the officers of the Indian government. This was not unimportant authority, for in order to get a description of the persons it was deemed wise that the Commission have authority to compel the applicant for enrollment to give it at first hand. The Mary Moore whose identity is drawn in question in this suit appears on the rolls made by the said Commission as a Choctaw Indian of full blood. She is enrolled opposite No. 734 in San Bois county. of the Choctaw Nation. The name of her father is given as Charlie Carney. The name of her mother is not given, but is marked "Dead." The age of the said Mary Moore is given on the date of her application for enrollment, to wit, October 12, 1898, as 22 years. She is enrolled on the said record as being at the head of a family, and the mother of three children, Dora (the Dora Anderson herein), Malinda, and Sampson (the Sampson Moore herein mentioned). The ages of said children at the said date of the said application for enrollment were given as 4 years, 7 years, and 8 months, respectively. The name of the father of each child is given, and the said Mary Moore given as the mother. There is nothing disclosed by the enrollment record which indicates that said record, was made up by the said Commission other than by the said Commission requiring under the above provisions of law the said head, to wit, Mary Moore, of said family to appear before it

and give the data on said roll contained. There is nothing on said enrollment record in connection with Mary Moore to. even suggest that she might have been in any wise related to Charlie Carney, except the descriptive part of said roll shows that at the time said application was made, in 1898, the father of Mary Moore was given as Charlie Carney. Indeed, this must have come from Mary Moore, and been given by her under her oath, authorized by the above provisions of the Curtis Act, to be administered to all applicants by any member of the Commission to the Five Civilized Tribes. So far as it is disclosed by this record, the identification of the said Mary Moore as being the one who is the daughter of Charlie Carney, a Choctaw Indian, has from the date of said enrollment never been questioned, until this lawsuit was brought some 26 years thereafter. Since the description of the persons so enrolled was required by law, to the end that their identity might not be confused with the identity of others of the same name, and this information was made by a body authorized to administer oaths and compel the attendance of the person seeking enrollment, we think, in line with numerous cases from this court and the federal courts, the identity as on that roll given is entitled to great probative force, and that such identity cannot be overcome by evidence other than of a strong cogent, and convincing quality.

To sustain the burden of showing that this Mary Moore was inaccurately identified as the daughter of Charlie Carney by the Commission to the Five Civilized Tribes, but should have been identified as the daughter of Charlie Keel, Sr., there is little if any persuasive testimony in the record. It must be noted that the said Mary Moore was 22 years of age in 1898. If living, she would be now (at the time of the trial of this case in 1924) 48 years of age. A witness, Norris Carney, a full-blood Indian, testified that he was 51 years old (only a difference of about 3 years); that he knew Charlie Keel, Sr.; that Charlie Keel was married twice; that he had a daughter named Mary, etc. He further stated that this was a long number of years ago. He said he had heard the name of Charlie Keel's first wife, but could not recall it. Another witness testified, by the name of Jackson Carn. He said he was 41 years old, that Mary Moore was the daughter of Charlie Keel by his first marriage. It is to be noted that this evidence was given in 1924. The defendants introduced an affidavit made by the said

Jackson Carn before I. L. Cook, notary public of Atoka county, Oklahoma, on November 20, 1916, for the purpose of establishing the heirs of certain members of the Keel family, which record was required to be made by the Superintendent for the Five Civilized Tribes, and in which affidavit the said Jackson Carn, in naming the children of the said Charlie Keel, Sr., gave them as Arfus Keel, Annie Keel, and Charlie Keel. This affidavit was also signed by Rebecca Carn, nee Sanford a maternal half-sister of the said allottee whose land is in question herein. In this affidavit, which was made 8 years before the evidence of this case, a matter of permanent record in the office of the Superintendent for the Five Civilized Tribes, no reference whatever is made that the said Charlie Keel, Sr., was the father of the said Mary Moore, described on the said rolls of the Dawes Commission as the daughter of the said Charlie Carney.

One F. M. Mowdy testified that he was 57 years of age. that he knew Charlie Keel, Sr., and that Charlie Keel told him that Mary was his daughter. (This evidence was given long after Charlie Keel was dead, and long after Mary was dead). One Joseph Wilson testified for the plaintiffs to the effect that one Reed Bond told him that the said Mary was Charlie Keel's daughter. There is nothing to show that there was any family connection between the said Reed Bond, the Keel family, or the Moore family, and if this evidence was admissible at all, we think it had little probative force. Mrs. Joe Wilson testified that she was 40 years old, that she had seen Mary Moore, and that Mary was a young girl about 15 years old when she first saw her. and that the witness (Mrs. Joe Wilson) was about 16 years old; that Mary was not married when she left home, and that she never knew her husband; that she never saw her after she left.

We think this evidence had no probative value, for there is nothing in it showing any knowledge on her part of the alleged Mary, the alleged daughter of Charlie Keel, being the Mary Moore, daughter of Charlie Carney. The witness says she was 16 years old, and that Mary was about 15, whereas, if Mary Carney, or Moore, had been living at the time this witness testified, she would have been about 48 years of age, or a difference of 8 years between that of the witness and the said Mary Carney, or Moore. But the witness places her age as younger than hers.

One Johnson Ott testified that he was 67

years of age; that he knew Charlie Keel, Sr., but that he did not know that Mary, who he said Charlie Keel told him was his daughter, married Moore. There is nothing in all of the testimony introduced by the plaintiffs which even indicates the reason why the Mary whose identity is herein questioned was given to the Commission to the Five Civilized Tribes as the daughter of Charlie Carney. There is no explanation made by Jackson Carn and Rebecca Carn, admitted relatives of the Keel family, as to why they made affidavit in 1916 as to the children of Charlie Keel and never made any reference to Mary. None of the witnesses undertook to testify that the Mary here in question was born to Charlie Keel during his marriage to his alleged first wife; nor that she appeared on any of these indian tribal rolls with the Keel family. To what family these Indians belonged could all but invariably be determined by the rolls made by the tribes, and at the time of enrolling applicants, in possession of the Dawes Commission.

We think that this was insufficient to overcome the presumption of the correctness of the descriptive identity of the said Mary Moore, for whom application was made to the Commission to the Five Civilized Tribes as the daughter of Charlie Carney. At the time of this application, the said Dawes Commission had access to the tribal rolls. The evidence before that body was taken before there was ever any land allotted to Mary Moore, or anyone else in the Choctaw Nation. There was no purpose to be subserved except the ascertainment of the truth. It was no doubt given by Mary Moore, then 22 years of age, in person, before the Dawes Commission, and by that body made a matter of record. Subsequent records made by the Keel family and filed in the office, which was the successor to the Commission to the Five Civilized Tribes, made no reference to Mary as the daughter of Charlie Keel. We are therefore unable to say that the judgment of the trial court was erroneous in holding that the presumption of the identity of Mary Moore as given by the enrollment record was not overcome by this character of evidence.

The judgment of the trial court is therefore affirmed.

NICHOLSON, C. J., and MASON, PHELPS, HUNT, CLARK, and RILEY, JJ., concur.

Note.—See 31 C. J. p. 490 §31 (Anno).