## COX et al. v. COLBERT.

No. 18925. Opinion Filed Feb. 26, 1929.

Cruce & Potter and Geo. E. Rider, for plaintiffs in error.

Don Welch and Ben Hatcher, for defendant in error.

BENNETT, C. Ben Pershica, an enrolled full-blood Chickasaw Indian, died intestate and unmarried in August, 1924, in Marshall county, Okla. He owned, at the time of his death, 280 acres of land, which constituted his surplus and homestead allotments, for which he held patents. He left surviving him three living children, Fred Pershica, McLane Pershica, and Joanna Mule, now Norton. He had another son, Jeff Colbert, who died in 1903, and Mary Colbert, the plaintiff below, defendant in error here, claims that she is the daughter and only issue of Jeff Colbert, and that upon his death she became, in his place, a prospective heir of Ben Pershica, deceased, her grandfather. After Ben's death, Mary brought this suit in district court of Marshall county, Okla., against Edwin B. Cox, Claude Chesnut, Fred Pershica, Josephine Pershica, and McLane Pershica, the plaintiffs in error, for possession of one-fourth interest in said lands and to quiet the title thereto and for partition. The parties will be referred to as plaintiff and defendants in the order in which they appeared in trial court.

The petition was in usual form, and the answers contained a general denial, and also alleged that Mary Colbert was neither the child of Jeff Colbert nor the grandchild of Ben Pershica, the allottee, and pleaded as res judicata a judgment of the county court of Johnston county, Okla., wherein the court found that Mary Colbert was not a child of Jeff Colbert. This judgment was rendered October 24, 1922, and will be hereinafter referred to. The issues as to the identity and relationship of plaintiff to Jeff Colbert and to Ben Pershica, the allottee, and res judicata, were the only vital issues presented to or tried by the court below. The evidence was documentary except an agreed statement of facts. Upon consideration of the evidence, the court found Mary Colbert was a daughter of Jeff Colbert, a granddaughter and heir of Ben Pershica, and entitled to one-fourth of the land of which Ben Pershica died seized as aforesaid, and ordered said lands partitioned, from which judgment defendants appeal. For reversal they present two propositions: (1) That the evidence is insufficient to support the judgment; (2) that the judgment of county court of Johnston county determining that Mary was neither the daughter of Jeff nor the granddaughter of Ben was conclusive.

The following facts are stipulated: That the lands in controversy lie in Marshall county, Okla., and were allotted and patented to Ben Pershica as a Chickasaw Indian, who died intestate in August, 1924, and left him surviving no wife, but left three children, Fred and McLane Pershica, and Joanna Mule, now Norton; that Jeff Colbert, who died in 1903 within the territorial limits of what is now Johnston county, Okla., was a son of Ben Pershica; that Jeff Colbert and Lizzie Conway were married November 3, 1902; they had two children before their marriage, namely, Joel Colbert and Bean Colbert; that Alice Hampton was the mother of Mary Colbert, the plaintiff; that after the death of Ben Pershica, and prior to the institution of this suit, defendant Joanna Mule, now Norton, conveyed to Edwin B. Cox all of her interest in the real estate allotted to Ben Pershica, the same being the real estate, the subject of this action. It was agreed that at the time of Ben Pershica's death there remained alive no issue of Jeff unless Mary were such.

The court made the following findings of fact:

"This is a suit on the part of Mary Colbert to establish that she is the daughter of Jeff Colbert, deceased, and entitled to inherit an interest in her grandfather's allotment.

(1) The court finds from the only evi-

dence offered in this case, to wit, the census card and enrollment record, that Mary Colbert was the daughter of Jeff Colbert, and she is the granddaughter of Ben Pershica.

(2) That during the year 1922, in the probate court of Johnston county, Okla., one Chastaine filed a suit to determine heirship of the estate of Jeff Colbert, deceased, and that the plaintiff herein was a party to that action, and filed an answer therein; that the judgment rolls in that case consisted of the pleadings, process and journal entry showing that the paternal grandmother of the plaintiff, Mary Colbert, died in the year 1918, and that the conveyance to Chastaine, who instituted this heirship proceedings, was made long prior to the year 1918, and that the journal entry showed that at the time it was rendered and entered of record, that Chastaine had been in possession of this land for more than 17 years.

"Therefore, the court finds that the transfer to the property involved in this probate proceeding was made sometime during the year 1905, and long prior to the year 1918.

"Conclusions of Law.

"The court, therefore, concludes, as a matter of law, that Mary Colbert, the plaintiff, is a regular and lawful heir, to wit, granddaughter of Ben Pershica, and that the probate proceedings had in Johnston county to determine heirship is void, and that she is entitled to recover the property in this action, and judgment will be entered accordingly.

"To which action of the court in his findings of facts and conclusions of law, both the plaintiff and defendants may have their respective exceptions."

1. Was the evidence sufficient to support the judgment that Mary Colbert was the daughter of Jeff Colbert and the granddaughter of Ben Pershica? It is contended, first, by the plaintiff, that this question was not raised, and is not now before the court for disposition by reason of the fact that no demurrer was filed to the evidence, and no proper exception taken to the findings of fact, but we prefer to deal with the question on its merits.

Since it is admitted that Jeff Colbert was the son of Ben Pershica, the inquiry now is: Was there evidence that Mary was the daughter of Jeff? Plaintiff introduced a certified copy of the census card of Mary Colbert which shows, opposite the Dawes Roll No. 2106, the name of Mary Colbert, one year old, female, three-fourths blood, a daughter of Alice Hampton No. 2104, age 25, female, one-half blood, name of father, Jeff Colbert. This is followed by an affidavit in the following words:

"Department of the Interior. Commission to the Five Civilized Tribes, United States of America, Indian Territory, Southern Judicial District.

"Alice Hampton being first duly sworn states the she is a citizen of the Chickasaw Nation of Indians. That she heretofore made application to the Commission to the Five Civilized Tribes for the enrollment of herself and family. That Jeff Colbert, the father, is enrolled by said tribe in Tishomingo county, and the mother, Alice Hampton in Tishomingo county. That there has been born to herself, to wit, on the _____ day of January, A. D. 1898, a female child, which has been named Mary Colbert.

her<br>"Alice X Hampton.<br>mark

"Witness P. B. Hopkins.

"Subscribed and sworn to before me this 28th day of September A. D. 1898.

"(Signed) P. A. ?<br>"Commissioner..

"In re Application for enrollment of Infant Child Mary Colbert as a citizen of the Chickasaw Nation.

"Approved Sept. 28, 1898.
"T. P. Needles."

It has often been held that the enrollment record of the Dawes Commision made pursuant to act of Congress is not only evidence as to the identity of the party thereby intended to be identified, but that such records are, in the absence of clear, unambiguous and convincing evidence, conclusive as to such matter. Section 21 of the Act of Congress of June 28, 1898 (30 Stat. L. 495) required the preparation of the rolls of citizens of the Five Civilized Tribes of Indians, and the "said Commission shall make such roll descriptive of the persons thereon, so they may be thereby identified. * * * The rolls so made, when approved by the Secretary of the Interior, shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them * * * shall alone constitute the several tribes which they represent."

It was necessary that such roll be made accurately for the allotments to such citizens were to be based thereon. Mowdy et al. v. Leeper, 122 Okla. 16, 250 Pac. 432.

"The Commission to the Five Civilized Tribes was a quasi judicial tribunal on which the Congress by Act of June 28, 1898, 30 Stat. at L. 495, c. 517, and the Creek Agreement of March 1, 1901, 31 Stat. at L. 861, c. 676, imposed the duty of making investigation and determining the names of those entitled to be enrolled as citizens and entitled to participate in the division of the tribal lands, and a decree of the commission denying an applicant the right of citizenship as a member of a tribe, which decision was af-

firmed by the Secretary of the Interior, is conclusive against such applicant to citizenship as a member of one of the tribes. United States v. Wildcat et al., 244 U. S. 111, 61 L. Ed. 1024." Page et al. v. Atkins, 86 Okla. 290, 208 Pac. 807.

The cases of Halsell v. Beartail et al., 107 Okla. 103, 227 Pac. 392, McFarland v. Harned et al., 115 Okla. 291, 243 Pac. 141, and Porter v. U. S. et al., 260 Fed. 1, might be cited to the same effect.

Was this record, standing alone, sufficient to support the finding and judgment of the court that Mary Colbert was the daughter of Jeff Colbert and Alice Hampton? If such record furnished evidence reasonably tending to support the finding, the finding and judgment must stand. Tate et al. v. Coalgate State Bank et al , 72 Okla. 276, 180 Pac. 687. It is contended by defendants that there was no evidence that Jeff and Mary Colbert were husband and wife, and this is based upon the fact that the affidavit was signed by the mother in her maiden name, and that no proof was offered indicating cohabitation, a living together as husband and wife, or that such relationship, if it ever existed, was assumed either under Indian tribal law or custom or under general law applicable thereto.

The presumption that every child is the offspring of a lawful marriage, and that the mother, either by actual marriage or by cohabitation and recognition, was the lawful wife of the father, can only be rebutted by clear proof to the contrary. Orthwein v. Thomas (Ill.) 13 N. E. 564. See, also, Johnson v. Johnson, 30 Mo. 72; Strode v. Magowan, 65 Ky. (2 Bush.) 621; In re Seabury, 1 App. Div. 231, 37 N. Y. Supp. 308.

In controversies involving heirship and the legitimacy of children, the presumption of law is in favor of legitimacy, and the reason back of this presumption is that the law encourages decency and morality and right living. Locust et al. v. Caruthers, 23 Okla. 373, 100 Pac. 520. 3 R. C. L. p. 725 lays down the general doctrine:

"It has been said that the law presumes that every child in a Christian country is prima facie the offspring of a lawful, rather than of a meretricious, union of parents. * * * Filiation being established, legitimacy is presumed."

The presumption in favor of marriage and the legitimacy of offspring is strengthened by lapse of time. In re Pickens' Estate, 163 Pa. St. 14, 29 Atl. 875. The same doctrine is emphasized in Bruner v. Engeles, 88 Okla. 277, 213 Pac. 307. In the case of McFarland et al. v. Harned et al., 115 Okla. 291,

243 Pac. 141, this identical question was presented and passed upon. We quote from the opinion :

"It is contended by the defendants in error, as we understand it, that there is evidence in the record reasonably tending to support the general finding and judgment of the trial court to the effect that Willie McFarland was an illegitimate son of Andrew McFarland, and therefore is not entitled to inherit his allotment. In order to determine this question, it will be necessary briefly to review the evidence as disclosed by the record, applying thereto rules of law heretofore established in this jurisdiction. A certified copy of the enrollment record of Andrew McFarland and of Willie McFarland was introduced in evidence by the plaintiff in error, and these instruments established the fact that Andrew McFarland was the father of Willie McFarland, and that Lillie Homer was his mother. In other words, these instruments conclusively identified Willie McFarland as the son of Andrew McFarland and Lillie Homer. Page v. Atkins, 86 Okla. 290, 208 Pac. 807; Halsell v. Beartail, 107 Okla. 103, 227 Pac. 392. **The parentage of Willie McFarland being thus established by the enrollment record, the presumption is that his parents were lawfully intermarried."**

In the case of Porter v. U. S. et al., 260 Fed. 1, the court said:

"Having concluded that the name Lettie McGilbra, as it appeared upon the original 1895 tribal roll, represented not Nellie Porter, nor Nellie Deer, nor Nellie McGilbra, but Lettie McGilbra, an entirely different person, the appearance of that name on the 1895 tribal roll under the circumstances of this case must be treated in contemplation of law as the application of Lettie McGilbra for enrollment by the Dawes Commission. They entertained that application when they transferred the name to the census card. They then, pursuant to such application, proceded to investigate her right to enrollment. However misleading, or however far from the truth, may have been the information secured in the course of such investigation, still, the person whose right to enrollment was being investigated was the individual represented by the name on the tribal roll. She was the applicant. This applicant was Lettie McGilbra. The Commission acted favorably on said application and enrolled the applicant. It follows that this name on the approved roll represents not Nellie Porter, nor Nellie Deer, but Lettie McGilbra, deceased, daughter of Lizzie McGilbra."

In the case of Halsell v. Beartail, supra, the court said:

"In doing this (preparation of the Dawes Commission rolls) it was necessary, where the person being enrolled did not appear on the tribal rolls, to determine the parents of the person being enrolled as his right to en-

rollment as a member of that tribe depended upon the tribal identification of such person. In compliance with this requirement of Congress, the Dawes Commission, in enrolling Lila Collins, found that her mother was Cinda and her father was Nocus Hutchee Dick, both of the Ketchapatak Town. * * * In the instant case, it is clear that the Dawes Commission was investigating the right to enrollment of the person who appeared on the tribal rolls of 1890 as Nocus Harjo, and on the tribal rolls of 1895 as Nocus Hutchee Dick, and who was a member of Ketchapatak Town, and that was the person enrolled, and it further appears that the Commission found that this person was the father of Lila Collins and Polly Washington. Following the rule announced in Page v. Atkins, supra, this record evidence is conclusive as to the identity of the various members of the tribe interested in this litigation, in the absence of clear, unambiguous, and convincing evidence clearly establishing error or mistake."

Mary Colbert at the time of her enrollment was only one year old, and did not, of course, appear upon any of the rolls previously made.

"The enrollment record made by the Commission to the Five Civilized Tribes, under the said section 21 of the said Act of Congress of June 28, 1898, and that part thereof which is descriptive of the persons so enrolled is prima facie evidence as to the matters shown thereon such as parentage, etc., and if the persons so shown thereon as being the parents of the allottee are contended not to have been such parents, the burden is on the party asserting the incorrectness of such enrollment record, and the same cannot be overthrown, except by clear, cogent and convincing proof." Mowdy v. Leeper, 122 Okla. 16, 250 Pac. 432.

In the body of the opinion, in the last case, the court says:

"Since the description of the persons so enrolled was required by law, to the end that their identity might not be confused with the identity of others of the same name, and this information was made by a body authorized to administer oaths and compel the attendance of the person seeking enrollment, we think, in line with numerous cases from this court and the federal courts, the identity as on that roll given is entitled to great probative force, and that such identity cannot be overcome by evidence other than of a strong, cogent and convincing quality."

Referring to the evidence the court said:

"We think that this was insufficient to overcome the presumption of the correctness of the descriptive identity of the said Mary Moore, for whom application was made to the Commission to the Five Civilized Tribes as the daughter of Charlie Carney."

Several of these cases indicate, perhaps, a rather striking lack of uniformity and consistency among the Indians with reference to their names, but this, we think, is easily understood.

The defendants rely upon and refer us to the case of Tancred v. Holuby, 124 Okla. 97, 254 Pac. 75. The court, in that case, reaffirms the ancient and well-supported doctrine that there is a presumption of legitimacy where parentage is shown, but that the said presumption is a rebuttable one, and in that case the trial court found that the presumption of legitimacy was met and overcome. That case differs essentially from the case at bar; First, in that the certified copy of the enrollment record introduced there contained affidavits by the mother, and also the grandmother of Martin Gambler, whose legitimacy was being inquired into, to the effect that "a male child was born to Hepsey McGilbray on the 16th day of October, 1903; that Hepsey McGilbray was about 20 years of age, a citizen by blood of the Creek Nation, and not the lawful wife of John Gambler, and that said child was named Martin Gambler and is now living." The record also contains the testimony of Hepsey given at the time of enrollment of Martin to the effect that John Gambler was the father of Martin, but that she was not married to John Gambler. So that, it appears clear that the record itself, which was introduced to show parentage, also showed illegitimacy, and upon consideration of this and other evidence offered in the case, the court found, and perhaps quite properly, that Martin was an illegitimate. Too, the evidence was in sharp conflict on this issue. In the case at bar, there is nothing to indicate that the parties were not married, or the illegitimacy of Mary, save the affidavit by the mother in her maiden name. We think a deduction from this, that the parents were not man and wife and that the child is illegitimate, under the rule announced in such matters by this court, would not be proper. The enrollment record made out a prima facie case, and since there was no evidence to the contrary, the court's finding thereon was correct.

In Mowdy v. Leeper, supra, the evidence on one side was confined to the enrollment record alone. There was evidence to the contrary, but the court decided in favor of the enrollment record. We think the case at bar is stronger, since the enrollment record is the only evidence in the case on that point. In the case of Bruner v. Engeles, supra, it was held to be the uniform rule

that every child is presumed to be legitimate, and, in the absence of proof to the contrary, no proof of marriage of parents is necessary.

For the reasons stated we conclude that the evidence is sufficient to sustain the finding of the court that Mary Colbert was the daughter of Jeff Colbert and the granddaughter of Ben Pershica.

2. The next and last proposition is that the plaintiff is barred from recovery by the decree of the county court of Johnston county determining that Mary Colbert was not the daughter of Jeff Colbert. That was a proceeding brought by J. B. Chastaine, who was not an heir and did not claim to be an heir at law of the allottee, Jeff Colbert. but based his right of action upon a petition which alleged that he was the record owner of certain lands of which Jeff Colbert died seized and possessed, subject to certain mortgages and his interest in the determination of the question of fact as to who are the heirs of Jeff Colbert, deceased, and desires that the court determine who are the heirs of Jeff Colbert, deceased, and their interest in said land, and that said petition is brought for said purpose and not for the purpose of paying debts of said estate; that Jeff Colbert, as well as his heirs, are full-blood Indians of the Chickasaw Tribe, and that this proceeding is instituted under the act of Congress and the laws of Oklahoma authorizing the determination of the heirs of the deceased allottee, and Mary Colbert was made a party to the proceeding under allegation that she claimed to be an heir of Jeff Colbert. The judgment rendered finds in substance that, in 1908, Lizzie Colbert, the wife of Jeff Colbert, deceased, died intestate and without issue, and that in 1918, the mother of Jeff Colbert, deceased, Susan Robinson, nee Crummey, died; that said father Ben Pershica is still living; that after the death of Jeff Colbert, and long prior to the death of said Lizzie Colbert, the said sole and only heirs at law of said Jeff Colbert, deceased, to wit, Susan Robinson, nee Crummey, Ben Pershica and Lizzie Colbert, each and all for a valuable consideration paid to them, conveyed all the right, title, and interest inherited and owned by them and each of them in and to the lands of Jeff Colbert, deceased, by good and sufficient deeds of conveyance, which said deeds were duly approved by the Secretary of the Interior and the county court of Johnston county, Okla., to J. B. Chastaine, whereby said Chastaine became the absolute owner of said land; that said petitioner entered into possession of the same under said conveyances, and has been in continuous, open, uninterrupted possession thereof for more than 17 years, and is still the owner of said land in fee simple.

It is evident that Chastaine took his conveyance before statehood, and also before the passage of the Act of Congress of June 14, 1918, upon which he relies. It will be observed that Chastaine was neither an heir of Colbert, nor of Pershica; that the lands in controversy herein are situate in Marshall county, and were the allotments of Pershica, and that the lands, the subject of the special proceeding before the county court aforesaid, were the allotments of Colbert, and were situated in Johnston county; that Chastaine acquired his estate by deed before statehood. The act of Congress referred to above has been given a very exhaustive study by Judge Kennamer in Homer v. Lester et al., 95 Okla. 284, 219 Pac. 392. A part of the syllabus is as follows:

"The heirship Act of Congress approved June 14, 1918, does not authorize the petitioner or the county court in the heirship proceedings to bring in before the court any person other than a person claiming to be an heir of the deceased allottee. * * *

"The judgment of the county court (or the district court on appeal) in the proceedings authorized by the Act of Congress of June 14, 1918, is not binding on or res adjudicata as to any person claiming an interest in or title to the allotment acquired by a conveyance or deed or contract executed prior to the act of June 14, 1928. * * *

"That part of Senate Bill No. 60, entitled, 'An Act to provide for determination of heirship in all cases of deceased persons,' etc., approved April 4, 1919, attempting to confer jurisdiction on the county courts to render a judgment binding on record claimants, that is, persons who claim title to the land by purchase from heirs or alleged heirs, 'where the time limited by law * * * for the institution of administration proceedings has elapsed without their institution, as well as in cases where there exists no lawful ground for the institution of administration proceedings in said court,' violates section 12 of article 7 of the Oklahoma Constitution, and is void."

In the case of In re Jackson's Estate, 117 Okla. 151, 245 Pac. 874, the court said:

"The extent of the holding of this court in Homer v. Lester was that purchasers from restricted heirs, whose rights as such had attached prior to the taking effect of the Act of June 14. 1918, were within the protection of section 12. art. 7 of the state Constitution, and the county court had no jurisdiction to enter any judgment affect-

ing their interest in the lands so purchased by them."

In Re Jessie's Heirs, 259 Fed. 694, wherein the same congressional act was under discussion, it is said in the syllabus:

"Action of a county court of Oklahoma in determining the heirs of a full-blood member of one of the Five Civilized Tribes of Indians is a nullity as to parties having a vested interest by virtue of a conveyance approved by the county court prior to June 14, 1918, except in ordering or decreeing a partition or sale arising under its probate jurisdiction."

It is further said in that case:

"When a conveyance from a full-blood member of the Five Civilized Tribes, approved by the county court without the determination of heirship, vests rights in allotted lands of such tribes in the grantee, no letters testamentary or of administration having been granted and the time limited by the laws of this state for the institution of proceedings therefor having elapsed without such application having been begun, as well as in cases where there exists no lawful ground for the institution of such proceedings in such court, **the county court then has not the power to determine heirship in so far as it affects such title theretofore vested in such grantee or his assigns.** Section 12, art. 7, state Constitution."

Before the passage of this congressional act, the county court had no power to determine heirship except as an incident to its probate jurisdiction. The proceeding in the county court was instituted and prosecuted by one who was not an heir, and one whose right or title to the realty the subject of the proceeding could not have been affected in any wise by the finding of the county court, under the holdings noted, nor could his rights have been affected by a judgment of the district court on appeal of such proceeding from the county court to said district court. This proceeding was brought, therefore, by one who was immune from harm by any unfavorable holding, against the heirs of Colbert for the purpose of securing a finding against such heirs that would conclude them as to their rights respecting Colbert's land and have the plaintiff's rights made sure therein. Could a finding upon such facts be valid and binding against the defendants in such proceeding?

A lawsuit is not a unilateral proceeding. The right to secure an enforceable judgment carries with it the necessary liability of being concluded by such judgment if unfavorable to the acting party. There must be mutuality to make a judgment effective.

"A person who would not have been bound by a judgment against the party in whose favor it was rendered, cannot, as a general rule, avail himself of such judgment as res judicata, as such judgment is ordinarily wanting in the requisite mutuality of effect upon the person pleading and the person against whom it is pleaded." De Watteville et al. v. Sims, 44 Okla. 708, 146 Pac. 224.

The court in the opinion says further:

"* * * A test of mutuality being found in inquiring whether the judgment would have been binding on the party urging it as res judicata if it had been against him or the party favored by it."

Many authorities are cited to the same general effect. In 34 C. J. p. 988, par. 1407, wherein the text reads:

"* * * And conversely no person can claim the benefit of a judgment as an estoppel upon his adversary unless he would have been prejudiced by a contrary decision of the case."

—citing cases from scores of jurisdictions and we find in this authority no contrary holding.

It is elementary learning that those primarily bound by a judgment are the parties thereto and their privies. In the case of Alfrey v. Colbert et al., 44 Okla. 246, 144 Pac. 179, the first paragraph of the syllabus is as follows:

"In order to constitute a good plea of res judicata, the following elements should be apparent: First, the parties or their privies must be the same; second, the subject matter of the action must be the same; third, the issues must be the same, and must relate to the same subject-matter; fourth, the capacities of the persons must be the same in reference to the subject-matter and to the issues between them—and where these elements are clearly apparent, the plea should be sustained."

The third paragraph reads as follows:

"When a former judgment is set up as a bar or estoppel, the question whether there is such an identity of the parties and of the subject-matter or cause of action as will support the plea of res judicata is a question of law for the court when it is determinable from an inspection of the record."

Can it be successfully argued that the judgment sought to be used here as a bar to plaintiff meets these requirements? J. B. Chastaine was sole plaintiff in the proceeding before the county court. He is not a party to this action. The defendants in the proceeding are alleged to have been the heirs of Jeff Colbert. Several of the defendants in the case at bar were not parties to that

proceeding. It is true that Ben Pershica and Mary Colbert were parties, Pershica making no defense and Mary actually defending, but even a personal appearance could give to that court no jurisdiction of the subject-matter so as to render an effective judgment binding one who claimed title to an allotment acquired by conveyance prior to the congressional act under Homer v. Lester, supra, and it would seem that appearance would not dispense with that mutuality as to the operation of the judgment required under De Watteville v. Sims, supra, and the other cases cited in that behalf. Again, no party to this action has acquired any right or claim under Chastaine, the plaintiff, in the county court proceeding. To constitute one a privy to an action, he must have acquired an interest in the subject-matter of the action, either by inheritance, succession, or purchase from a party subsequently to the action, or he must hold the property subordinately. Brown v. March, 111 Okla. 288, 242 Pac. 155.

"No one can be bound by or take advantage of the estoppel of another who does not succeed or hold subordinately to his position." Allred v. Smith, 135 N. C. 443.

To the same effect: Butler v. Fryer, 59 Okla. 274. 159 Pac. 367; Seymour v. Wallace, 121 Mich. 402.

"Strangers to a record, neither parties thereto nor in privity with the parties, are not estopped by the judgment nor can they take advantage of it as a bar, and it is immaterial that they may claim under the same common source of title, if there is no privity in estate." 23 Cyc. p. 1206, and cases cited.

Again, in Cressler v. Brown, 79 Okla. 170, 192 Pac. 417, in the opinion, it is said:

"Privies in estate or title are only bound in relation to the property involved in the suit." (Citing Hart v. Moulton [Wis.] 76 A. S. R. 881).

The children of Ben Pershica and their grantees, who now are claiming the benefit of the heirship decree, were not parties to the heirship proceeding, and their only colorable right to use the decree as a bar to plaintiff is that they are heirs to Ben Pershica, but the proceeding to which Ben Pershica was a party had as its subject-matter entirely different lands, lands belonging to another allottee and situate in another county.

It should be noted also that the only issue in the heirship proceeding was between the plaintiff Chastaine and the defendants. The defendants raised and tried out no issue as between themselves. It is well recog-

nized that a judgment settles nothing between codefendants or coplaintiffs, unless their conflicting or hostile claims are brought into issue by some sort of pleading. 23 Cyc. 1279-80, and cases cited; 15 R. C. L. 1013; Smith v. Braley, 76 Okla. 220, 184 Pac. 586.

The purpose of the action at bar was to recover real estate which belonged to the allottee, Ben Pershica, the grandfather of plaintiff, the title to which land has never been in litigation between the plaintiff and the defendants, certainly to such an extent as to preclude the assertion of her title as against defendants, and we hold, therefore, that the plaintiff has established, by sufficient evidence, that she was the daughter of Jeff Colbert, the granddaughter of Ben Pershica, and that the judgment of the county court in the heirship proceeding does not estop the plaintiff. We therefore hold that the judgment of the trial court should be affirmed.

HALL, DIFFENDAFFER, HERR, and LEACH, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (4) 15 R. C. L. p. 1046. See "Indians," 31 C. J. §98, p. 524, n. 51. "Judgments," 34 C. J. §1324, p. 913, n. 43; §1325, p. 915, n. 55; §1405, p. 984. n. 36; §1480, p. 1043, n. 14.